## In re NEW YORK ASBESTOS LITIGATION.

**John Consorti, Alfred Luchnick, Peter Pulizzi, Vincent Tabolt, Plaintiffs.**

**Nos. 92 Civ. 6377 (RWS), 92 Civ. 7283 (RWS), 92 Civ. 2402 (RWS) and 92 Civ. 0763 (RWS).**

United States District Court, S.D. New York.

Jan. 21, 1994.

Opinion Granting Reargument in Part and Denying it in Part Feb. 18, 1994.

Levy Phillips & Konigsberg, New York City (Robert I. Komitor, Moishe Maimon, of counsel), for plaintiffs.

McCarter & English, Newark, NJ by Richard P. O'Leary, for defendant Keene Corp.

Flemming, Zulack & Williamson, New York City (Cynthia B. Rubin, of counsel), for defendant Flintkote Co.

Hinckley & Silbert, P.C., New York City (Craig F. Wilson, of counsel), for defendant Owens–Corning Fiberglas Corp.

Gladstein & Isaac, New York City (Peter L. Herb, of counsel), for defendant Veteran's Pipe Covering.

Lester Schwab Katz & Dwyer, New York City (Cynthia Weiss Antonucci, of counsel), for defendant Fibreboard Corp.

Winick & Rich, P.C., New York City (Abraham Y. Skoff, of counsel), for defendant Atlas Turner, Inc.

Anderson Kill Olick & Oshinsky, P.C., New York City, and Whiteford, Taylor & Preston, Baltimore, MD (Warren Weaver, Jennifer W. Darger, Margaret A. Weiner, of counsel), for defendant Porter Hayden Co.

## OPINION

SWEET, District Judge.

After twenty-five days of trial, the jury in this consolidated trial reached special verdicts awarding over $47 million in damages on behalf of plaintiffs John and Sharon Tabolt, John and Francis Consorti, Alfred and Joselyn Luchnick, and Peter and Anne Pulizzi against six defending corporations and a number of other settling and non-party defendants. These verdicts are annexed as Appendix A (*Tabolt*), B (*Consorti*), C (*Luchnick*) and D (*Pulizzi*) and were the subject of post trial motions of the defendants which are granted in part and denied in part as set forth below. The order of the dispositions will follow the order of the verdicts which were rendered. In addition, a number of issues are common to certain of the cases and will be dealt with as they arise. Those relating to the molding of judgments will be resolved after the consideration of particular verdicts.

### Prior Proceedings

The procedural path that these cases followed from their filing to their eventual consolidation for trial in this Court is fully recounted in prior opinions, familiarity with which is assumed. *See In re New York Asbestos Litig.,* 149 F.R.D. 490 (S.D.N.Y. 1993); *In re New York Asbestos Litig.,* 145 F.R.D. 644 (S.D.N.Y.1993). These cases were consolidated for trial by order and opinion of this Court dated February 12, 1993. *See In re New York Asbestos Litig.,* 145 F.R.D. 644 (S.D.N.Y.1993). On June 10, 1993, this Court denied several of the defendants' motions to reconsider the consolidation of these actions, and denied a motion by the Keene Corporation for a stay of this litigation. *See In re New York Asbestos Litig.,* 149 F.R.D. 490 (S.D.N.Y.1993).

The Special Verdicts were rendered seriatim on July 22, 23, and 24, 1993, and on August 19, 1993 certain motions were filed seeking discovery with respect to judgment molding. Post trial motions pursuant to Rule 50(b) of the Federal Rules of Civil Procedure were made September 14. Oral argument concluded on the post-trial motions of all parties on October 14, 1993. On October 15, 1993, the plaintiffs' attorney supplied the Court with copies of his retainer agreements with the plaintiffs. On November 23, 1993, the plaintiffs' attorney sent to the Court by mail a copy of the decision of the New York Court of Appeals in *In re New York County Asbestos Litigation,* which is reported at 82 N.Y.2d 342, 604 N.Y.S.2d 884, 624 N.E.2d 979 (1993). These motions were considered fully submitted as of November 23, 1993.

### TABOLT

The Flintkote Company ("Flintkote") was the sole defendant, other than settling and non-party defendants, to the claims brought on behalf of Vincent Tabolt ("Tabolt"), who had been employed at the Lowville Builders Cooperative where he worked in the cement room and thereafter as a stock clerk. During the cement room period Tabolt was exposed to asbestos cement, but there was no identification of Flintkote products used during that period. Tabolt's exposure as a stock clerk to Flintkote roofing shingles and Flintkote Orangeburg pipe, a plastic pipe containing asbestos, and the extent of that exposure, was the determinative issue.

### The Tabolt Action Was Properly Consolidated

The applicability of *Malcolm v. National Gypsum Co.,* 995 F.2d 346 (2d Cir.1993), to the consolidation issues here was considered in the opinion of the Court dated June 10, 1993. *See* 149 F.R.D. 490 (S.D.N.Y.1993). The factors considered there and in the prior opinion of February 12 included worksite, occupation, time of exposure, disease type, whether the plaintiff was alive or dead, discovery, counsel, and the existence of cancer, all relevant as to the issue of the ability of the jury to differentiate between parties and issues.

### Worksite

In the four cases that went to trial there were ultimately two relevant worksites. Luchnick and Pulizzi had their exclusive exposure in the Brooklyn Navy Yard during the same years, 1942–45, and Tabolt's exclusive exposure was in the Lowville Farmers' Cooperative. Because of the nature of the product identification proofs in the Consorti case,

which were not site specific, his numerous worksites were irrelevant and not the subject of proof. Because of their limited number, no confusion resulted from the worksites involved.

### Occupation

Whatever the impact of dissimilar occupations might have been upon a defendant's "state-of-the-art" defense, none of defendants here made any attempt to distinguish state-of-the-art knowledge by occupation, such as users as opposed to bystanders, shipyard workers or construction workers, or even stock clerks. The distinctions made by the defendants were with respect to disease (asbestosis, lung cancer, and mesothelioma) and factory as opposed to end product exposure. Accordingly, as a practical matter, and for purposes of the instant inquiry, the occupations of the four plaintiffs were functionally equivalent from the point of view of state-of-the-art evidence.

### Times of Exposure

Again, the actual offering and presentation of evidence to the jury, along with the limiting instructions given throughout the trial by the Court, clearly distinguished the applicable periods of time. Liability evidence dated after 1945 was carefully excluded in its offer, receipt, and presentation from the Luchnick and Pulizzi cases.

### Disease Type

All four of the cases which went to trial dealt with undisputed mesotheliomas.

### The Living and the Dead

At the time of trial, John Consorti ("Consorti") was still alive, but the fatality of his disease is certain. Since there was no possibility that the asbestos-related disease of the living plaintiff would not prove fatal, *In re Joint E. & S. Dists. Asbestos Litig.,* 125 F.R.D. 60, 66 (E.D.N.Y.1989), no prejudice could result from trying the claims of a living plaintiff with those who had already died.

### Discovery Status

There has been no showing that consolidated discovery practices were in any way prejudicial.

### Counsel

The commonality of plaintiffs' counsel favored consolidation and the cooperation and coordination amongst defense counsel also helped to avoid confusion.

### Cancer

As mentioned above, all plaintiffs had the same type of cancer, pleural mesothelioma.

### Differentiation

Specialized notebooks with photographs of and undisputed biographical information about each plaintiff, along with a list of remaining defendants in each case, were provided to the jury, the members of which took copious notes throughout the trial.

Demonstrative charts distinguishing the separate plaintiffs and the defendants in each case, along with exposure histories for each plaintiff, were used by counsel in their openings.

Cautionary instructions were continuously given to the jury throughout the trial and in the charge concerning the admission of evidence limited to a certain case or a certain issue, and the need to consider each case separately. Moreover, where appropriate, counsel delineated offers of evidence by case and/or defendant.

The summations of counsel addressed each claim separately, utilizing charts which included time lines in order to distinguish between the different relevant periods for liability purposes, as well as citations to the trial record for arguments regarding specific evidence.

Detailed special verdict forms called for separate determinations of each issue in each case as to each party. There was no conflict between any of the verdicts and no confusion expressed or demonstrated in the rendering of separate verdicts in each of the cases, except as to the Court's charge on the non-economic consortium claim in *Consorti,* Verdict Question 5(h), where the jury awarded damages for the period of Consorti's normal life expectancy (26.2 years) instead of the 9 months it found he would survive with his mesothelioma, and the conflict in the answers on the *Tabolt* special verdict form as discussed below.

As to Consorti, since there was no single site involved, his case was particularly appropriate for consolidation. As has already been discussed, no meaningful distinction could have been made between Consorti's medical condition and those of the other defendants, and no such effort was made by the defendants. Consolidation was therefore appropriate.

A review of the Flintkote defense establishes that its position was unique and easily understood, namely, that Tabolt was not exposed to asbestos through its products. The distinctiveness of its position, in the context of the testimony and the limited number of products involved, precluded any confusion from arising out of the principal Flintkote defense. To consolidate the case, with the concomitant savings with respect to testimony concerning the state of the art and mesothelioma and its relationship to asbestos, was appropriate.

### There Was Sufficient Evidence on Exposure To Require Submission Of The Issue To The Jury

■ The principal contention advanced by Flintkote in its defense to the Tabolt claim is that there was insufficient evidence of exposure to Flintkote products to permit the case to be submitted to the jury. The lynchpin of this defense was the quantum of proof that Tabolt handled the Flintkote product and that the product produced asbestos in an inhalable form.

The Flintkote pipe at issue is black bituminous fiber pipe made from paper products mixed with asbestos into a pulp, cured in rolls, soaked in hot coal tar pitch (the bitumen), and manufactured by a division of the Flintkote Company called Orangeburg. The pipe had orange lettering spelling "Orangeburg" across the length of the pipe. No one at trial ever stated that the pipe at Lowville was seen to have the Orangeburg logo, and Tabolt himself prior to his death did not claim exposure to any black pipe although his duties included handling the pipe.

Bourcy, a salesman for a supplier to the Co-op who sold a rival brand of pipe called Bermico, testified by deposition that he saw "Orangeburg" pipe at the Co-op, since he knew that the pipe sold was not his product and that only Bermico and Flintkote made such pipe at that time, and that therefore he assumed it to be Orangeburg. However, he also testified that, while he had assumed the pipe was Flintkote's, he did not know whether the "Orangeburg"-type pipe was Flintkote's, Bermico's or some other brand, and that he could have determined what brand of pipe he had seen if he had looked because Flintkote's pipe carried the distinctive imprint of the Orangeburg trademark.

The co-workers at the Co-op testified that it was their practice to refer to all brands of black pipe as "Orangeburg" and that the pipe was a popular item with unique fittings so that competing pipe types are not interchangeable.

Two of Tabolt's co-workers testified that Flintkote's Orangeburg pipe was sold at the Co-op in shipments of at least one hundred lengths of pipe twice a month through the summer months, that Orangeburg pipe was a popular product, and that there were only two types of black drainage pipe sold—Orangeburg and Bermico. They also testified that the Co-op did not stock Bermico, that the fittings were different for Orangeburg and Bermico, that the pipe would break through the unloading process, that the pipe had a "dusty nature," and the dust would be suspended in air. Mrs. Tabolt testified that black and grayish dust was found on her husband's clothing and in his cuffs when she washed them.

Dr. Steven Markowitz, Tabolt's expert, testified that, assuming dust was created in the handling and breakage of black, tar-coated, asbestos-containing fiber pipe, dust would be inhaled into the lungs. Dr. Markowitz was not permitted to testify as to any knowledge of Tabolt's mesothelioma but only generally as to dust containing asbestos fibers.

Dr. Albert Miller, another plaintiffs' expert, testified generally with respect to the properties of asbestos and its ability to cause disease from dust containing asbestos. This general testimony was admitted as to all claims.

A Flintkote employee testified that 200 pounds of asbestos would be mixed with 1100

pounds of newsprint, 50 pounds of celite, and approximately 70 pounds of wood pulp in the manufacture of "Orangeburg," yielding an asbestos content of over 14%. These ingredients were covered by a black coating.

While Flintkote attacked the credibility of the co-workers, enough evidence was presented to permit an inference that Tabolt handled the Flintkote pipe and that dust resulted.

The types of proof which were submitted in this case—both circumstantial and otherwise—are sufficient to support a finding of product exposure and causation. *See, e.g., In re New York Asbestos Litig.,* 738 F.Supp. 66, 69 (E.D.N.Y.1990), *aff'd sub nom. Kreppein v. Celotex Corp.,* 969 F.2d 1424 (2d Cir.1992). Plaintiffs in courts in this jurisdiction have demonstrated exposure to dust from asbestos-containing products in order to prove asbestos exposure. *See, e.g., In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dists. Asbestos Litig.),* 971 F.2d 831 (2d Cir. 1992); *O'Brien v. National Gypsum Co.,* 944 F.2d 69 (2d Cir.1991); *Johnson v. Celotex Corp.,* 899 F.2d 1281 (2d Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990).

Flintkote has relied upon *Nogan v. GAF Corporation,* 1989 WL 161541 (M.D.Pa. May 24, 1989), where third-party John Crane brought a motion for summary judgment on the grounds that there was no proof that its products were friable, thus contending that there was no evidence that plaintiff was exposed to its products. In support of its motion, Crane submitted reports from experts who performed fiber release tests on its products which concluded that Crane's products did not release asbestos fibers when cut and handled. No proofs were submitted to rebut Crane's expert reports.

Here, from the evidence of asbestos in the pipe and the presence of dust resulting from handling the pipe in Tabolt's presence, the plaintiff sought to have the jury infer that the dust contained asbestos and that Tabolt's inhalation was the cause of his mesothelioma. That proof without contradiction required submission to the jury.

Although there were issues of credibility, there were sufficient facts established—the nature of black pipe, the existence of two competing brands, the exclusivity of the brands resulting from the fittings, the inability to sell the Bermico brand to the Co-op, and the belief of the co-workers that "Orangeburg" pipe was sold at the Co-op—for the jury to draw the inference that the Flintkote product was sold and produced dust when it was handled, and that Tabolt inhaled that dust which contributed to his mesothelioma.

### The State–Of–The Art Evidence Was Properly Admissible Against Flintkote.

■ *George v. Celotex Corp.,* 914 F.2d 26 (2d Cir.1990), held that a manufacturer of asbestos-containing products is held to the knowledge of an expert in its field. Scientific discoverability, rather than actual knowledge, is the standard by which the relevancy of such evidence is to be judged. Therefore, the knowledge of Eagle Pitcher and Johns Manville establishes not only their own responsibility but the level of knowledge achievable by an expert in the field.

It is Flintkote's position that voluminous "state-of-the art" documents were admitted without an evidentiary showing of the authenticity of those documents. The position is unfounded, for while all objections were preserved, it was established that the state-of-the art documents would be admitted on relevancy grounds unless challenged as to authenticity based on the representation that deposition evidence had been introduced which established the source of the documents and the grounds for admissibility. Some such objections were made and heard. Otherwise the documents were admitted. No error is claimed by Flintkote with respect to any particular document.

### Remittitur Is Not Appropriate With Respect to the Damages for Pain and Suffering

■ The authorities on the subject of excessive verdicts and remittitur are well known, have been cited effectively by both sides, and will not be repeated. They have recently been reviewed by this court in *In re Joint Eastern & Southern Districts Asbestos Litigation,* 827 F.Supp. 1014 (S.D.N.Y.1993)

(*Maiorana*), and *Koerner v. Club Mediterranee, S.A.*, 833 F.Supp. 327 (S.D.N.Y.1993). If remittitur is to be contemplated at all, reduction can only be permitted so far as the "maximum amount that would be upheld ... as not excessive" and not a penny less. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir.1990); *see also Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984). It is further understood that it is appropriate to refer to other determinations in other actions of a similar character, although the Honorable Charles Sifton has noted that asbestos litigation is at an early stage and there are not many years of experience or many verdicts upon which to build the necessary sense of consensus. *In re Joint E. & S. Dists. Asbestos Litig.*, 798 F.Supp. 925, 938 (E.D.N.Y.1992) (*McPadden et al.*), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.), *and rev'd on other grounds*, 995 F.2d 346 (2d Cir.1993).

■ Undoubtedly, as reflected in the record and as reviewed by his counsel, the pain and suffering experienced by Tabolt over the course of his illness was continual, severe and unrelenting. The jury's award of $7,500,000 for the ordeal of this 46 year old man was certainly not without basis in the record.

The principles relating to remittitur of multi-million dollar awards for pain and suffering in asbestos cases were set forth by Judge Sifton in *In re Eastern & Southern Districts Asbestos Litigation*, 798 F.Supp. 925, 936–38 (E.D.N.Y.1992), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.), *and rev'd on other grounds*, 995 F.2d 346 (2d Cir.1993). After considering the appropriate authorities on the subject, both state and federal, he concluded with respect to the facts then before him that a verdict of $4.5 million was not excessive for a decedent whose pain and

suffering had lasted for 11 months.[1] Judge Sifton also noted that the Honorable Helen Freedman, a Justice of the New York Supreme Court who also has had extensive experience in asbestos litigation, has allowed multimillion dollar awards for pain and suffering in the state court's Brooklyn Navy Yard consolidation.[2] It is fair to conclude that Justice Freedman no longer considers the factors which she found applicable to the remittitur of pain and suffering awards in asbestos-related personal injury suits in *Didner v. Keene Corp.*, Index No. 27373/89, N.Y.Sup.Ct. (Dec. 17, 1990), *reported in* N.Y.L.J., January 4, 1991, at 22 col. 2, controlling in view of the subsequent verdicts. While the amounts of the verdicts in this action are undeniably high, the suffering has been acute, particularly in the case of Tabolt who had to endure agonizing trips to New York to obtain treatment which ultimately proved unavailing.

The conscience of courts must not remain fixed in time but must rather retain the capacity for change based on the experience of others and the determinations made in particular cases. At the same time, in asbestos cases in particular, given the scale of the litigation, it is desirable to search for any norms that can be properly established. Using Judge Sifton's determination provides just such a baseline related to time which can appropriately be applied in these cases.

■ In *McPadden*, Judge Sifton found that no remittitur was required for an award of $4,500,000 for pain and suffering caused by an asbestos-related disease of 11 month's duration. *See In re Joint E. & S. Dists. Asbestos Litig.*, 798 F.Supp. 925, 937–38 (E.D.N.Y.1992), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.), *and rev'd on other grounds*, 995 F.2d 346 (2d Cir.1993). In

---

1. The decision in this case, involving the claims of Martin and Anne McPadden, was later reversed and the case was remanded because the Second Circuit found that Judge Sifton had impermissibly admitted evidence of post-injury corrective measures. *See In re Joint E. & S. Dists. Asbestos Litig.*, 995 F.2d 343 (2d Cir.1993). Reversal on issues relating to liability does not impair the validity of the principles relating to remittitur of judgments discussed by Judge Sifton.

2. This Court, as has been noted, recently relied upon Justice Freedman's earlier opinion relating to a personal injury suit involving asbestos-related cancer in *Didner v. Keene Corp.*, Index No. 27373/89, N.Y.Sup.Ct. (Dec. 17, 1990), *reported in* N.Y.L.J., January 4, 1991, at 22 col. 2, in reaching our verdict in *Maiorana*. There is, however, a distinction between the cases, since *Maiorana* involved a death resulting from colon cancer, not mesothelioma.

*Tabolt,* the jury heard testimony that the plaintiff began to experience pain related to his mesothelioma in May 1991, (Tabolt Video Tr. at 31–32, 6/3/92), and Tabolt died in November of 1992. The jury's award, therefore, could reasonably have contemplated 18 months of pain and suffering. Duration is a factor that courts may consider in assessing an award for pain and suffering. *Didner v. Keene Corp.,* Index No. 27373/89, N.Y.Sup. Ct. (Dec. 17, 1990), *reported in* N.Y.L.J., January 4, 1991, at 22 col. 2.

McPadden, therefore, was awarded $409,-090.91 per month of pain and suffering. If he had suffered for 18 months, as did Tabolt, his award based on this rate would have been $7,363,636.36, which is only $136,363.64 less than the jury's award for pain and suffering to Tabolt. While the verdict in *Tabolt* exceeds the *McPadden* verdict, the judicial conscience is not shocked, given the circumstances of his injury.

While Judge Sifton's discussion of the *McPadden* verdict indicates that Judge Freedman may have reconsidered the conclusions that she reached in *Didner* with regard to awards for pain and suffering, he offered no similar discussion with respect to awards for loss of consortium. Again in an effort to achieve some consistency and to exercise an appropriate judicial conscience, the determinations in *Didner* as to consortium are applicable here as they were deemed to be in *Maiorana.* The application of the *Maiorana* and *Didner* standards to *Tabolt* require the reduction of the consortium award to $1.5 million.

■ In the absence of any evidence to support a claim of $50,000 for wages lost prior to death and any opposition to Flintkote's motion in that regard, as a matter of law the motion to strike that portion of the verdict must be granted.

■ The jury's calculation of lost future wages in the amount of $1,700,000 was derived from evidence adduced during the trial, including testimony that Tabolt worked to (and including) age 70. Using a growth rate of 5.5%, his future lost wages would amount to $1,352,584, after reductions for possible unemployment and personal maintenance.

The record contains evidence particular to Tabolt that his wage growth rate between 1984 and 1990 was actually 8.75%, thereby providing a basis in the record for the increased award.

The jury was required to award and properly awarded "the full amount of future damages, as calculated without reduction to present value." N.Y.C.P.L.R. § 4111(f). Thereafter, N.Y.C.P.L.R. § 5041(e) requires the full amount of the future damage award to be reduced to present value by the court and then payments shall be made yearly with four percent to be added to each successive year's payment.

Flintkote's argument that this procedure provides a double recovery for inflation was rejected after thorough attention by the Appellate Division of the New York Supreme Court, Fourth Department, in *Brown v. State,* 184 A.D.2d 126, 128–29, 592 N.Y.S.2d 533 (N.Y.1992), *appeal denied,* 81 N.Y.2d 711, 600 N.Y.S.2d 442, 616 N.E.2d 1104 (1993). There the court "conclude[d] that the statute requires the trier of fact to account for inflation in making its award for future damages and, after the award is made, it requires the court to increase each subsequent annual installment payment by 4% over the previous year's payment." Although the court admitted that it was "unable to ascertain from the legislative history of the statute why the Legislature provided for a 4% increase in the annual payments after the trier of fact applies an inflationary factor in awarding the full amount of future damages," it found that "the statutory language is clear and the court properly complied with it. If there is to be any change in the method of computing the amount of awards for future damages, it must result from an amendment by the Legislature and not by a strained interpretation by the courts." *Id.* at 130, 592 N.Y.S.2d 533.

Flintkote cites two cases, *Alisandrelli v. Kenwood,* 1990 WL 20158 1990 U.S.Dist. LEXIS 2051 (S.D.N.Y. Feb. 27, 1990), and *Peterson v. Zuercher,* 152 Misc.2d 684, 584 N.Y.S.2d 968 (Sup.Ct.1992), which both predate and are of inferior precedential value to *Brown.* Both of these cases state, upon scant consideration, that Article 50–B of the N.Y.C.P.L.R. forbids juries to consider the

effects of inflation in making an award for future damages. The more recent date and superior precedential value of the *Brown* decision, together with the lengthy attention given to this issue in *Brown*, establish it as the correct interpretation of the New York statute.

### There Was a Basis For the Jury's Findings With Respect to Apportionment

■ In connection with apportionment, the jury was instructed to take the following two variables into account in determining the relative share of responsibility of the defendants and the non-party defendants:

(1) the degree of negligence of the conduct, and

(2) the extent of contribution to the causing of that plaintiff's illness.

With respect to the first factor, the degree of negligence, the jury was instructed:

[I]f all other forces are equal you would apportion a greater share of responsibility to a company that manufactured, distributed, or sold a product containing asbestos, the conduct of which was seriously negligent, reckless and wanton, more than to a company whose conduct narrowly missed compliance with the requirements of reasonable care.

(Tr. at 4503 7/22/93.)

Therefore, the defendant who was more negligent, who acted wantonly or recklessly, should bear a greater share of the liability for a plaintiff's illness.

With respect to the second factor, the jury was instructed:

[I]f all other factors are reasonably equal you would apportion a greater share of responsibility to a company that manufactured, distributed or sold an asbestos-containing product from which asbestos was inhaled by that plaintiff in large quantities over a large period of time than to a company whose product was inhaled by a plaintiff in a smaller quantity.

*Id.*

Some of the evidence presented to the jury upon which it could assess relative responsibility with respect to Tabolt's injuries is as follows:

(a) The Co-op where Tabolt worked sold a variety of asbestos-containing products, including black pipe, various asbestos-containing powdered cements (including A.P. Greene refractory cement, Georgia Pacific joint compound, United States Gypsum Hy–Lite, Structo–Lite, wood fiber plaster cements and joint compound, and W.R. Grace Monokote), and other asbestos-containing products (including GAF cement board and Armstrong vinyl floor tile), (Tr. at 526–27, 530–36, 6/24/93; 1597–1615, 7/6/93; 3881, 7/20/93);

(b) Tabolt's job duties included unloading shipments, handling products in the course of stocking and selling them, and cleaning up any breakage, (Tr. at 532–33, 6/24/93; 1606–13 7/6/93);

(c) Deliveries were made to the Co-op on a weekly basis, (Tr. at 1580, 7/6/93);

(d) When cements were delivered to the Co-op, the bags sometimes broke, creating dust that had to be cleaned up by Tabolt or co-workers, (Tr. at 531, 6/24/93);

(e) The cements to which Tabolt was exposed included A.P. Greene refractory cement, Georgia Pacific compounds, United States Gypsum Hy–Lite, Structo–Lite, wood fiber plaster and joint compounds, and W.R. Grace Monokote, all of which contained asbestos, (Tr. at 3881, 7/20/93), and all of which were delivered to the Co-op in paper bags, (Tr. at 1580–91, 1610–13, 7/6/93);

(f) Black pipe contained asbestos, (Tr. at 1349, 7/1/93);

(g) Handling black pipe generally created about as much dust as handling the cements, (Tr. at 556–57, 6/24/93);

(h) In relative terms, the Co-op sold four times as much cement as black pipe, (Tr. at 2303–04, 7/9/93); and

(i) Tabolt was also exposed to other asbestos-containing products, including Armstrong vinyl tiles and GAF cement board, (Tr. at 3881, 7/20/93).

Flintkote was given an allocation of fault of 21%, which in view of the instructions and the evidence is justifiable.

Allocations of fault were made between those against whom evidence was presented, whether they were present during the trial or not (non-party defendants). There were others who settled with Tabolt, and Flintkote is entitled to an offset for those settlements in accordance with *Williams v. Niske,* 81 N.Y.2d 437, 599 N.Y.S.2d 519, 615 N.E.2d 1003 (1993). *See* Verdict Molding Section, *infra.*

However, as a prior step in establishing liability, the jury found that asbestos-containing products of Armstrong World Industries were a proximate cause of Tabolt's mesothelioma under an instruction that a product must have been a substantial contributing factor in bringing about injury to establish proximate cause. Thereafter, the jury assigned a 0% of relative responsibility to Armstrong.

"When special interrogatories are submitted to a jury pursuant to Fed.R.Civ.P. 49(a), the jury's answers thereto 'must be consistent with each other,' since they form the basis for resolving the case." *Brooks v. Brattleboro Mem. Hosp.,* 958 F.2d 525, 529 (2d Cir.1992) (quoting *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 890 (2d Cir.1988)). Although a court evaluating a claim of inconsistent answers to special interrogatories must attempt to resolve any apparent inconsistency, "[i]f the jury's answers cannot be harmonized rationally ... a new trial [must be] ordered." *Id.; see also Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 891 (2d Cir.1988).

Here, the failure to assign any relative responsibility to Armstrong cannot be rationally harmonized with the finding that Armstrong's products proximately caused Tabolt's mesothelioma. *See Brooks,* 958 F.2d at 529–30 (failure to award damages for pain and suffering fatally inconsistent with finding of causation of pain and suffering); *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir. 1990) (impossible to reconcile special verdict form answer that arresting officer had acted in good faith with other answer that officer acted maliciously, wantonly, or oppressively).

The Second Circuit has held that, when a jury's inconsistent answers on a special verdict form can not be harmonized, a court may not simply disregard or eliminate an inconsistent answer. "Such a result does not reconcile the inconsistency, but simply overrules one inconsistent answer." *Auwood,* 850 F.2d at 891–92. To enter a judgment that disregards any material jury finding is an abrogation of the parties' rights under the Seventh Amendment to the United States Constitution. *Id.* at 890–91; *see also Finnegan,* 915 F.2d at 821 ("[W]e cannot give effect to one jury finding directly contradicted by another.... To do so would be inconsistent with the parties' right to a trial by jury."); *Schaafsma v. Morin Vermont Corp.,* 802 F.2d 629, 645 (2d Cir.1986) (error for district court not to grant new trial when jury returns inconsistent verdicts); *Bernardini v. Rederi A/B Saturnus,* 512 F.2d 660, 662 (2d Cir.1975) ("[W]hen special verdicts cannot be reconciled ... the court may not enter a judgment."). A new trial as to the allocation of liability between Flintkote and the non-party defendants must therefore be ordered. *Brooks,* 958 F.2d at 529, 530; *Auwood,* 850 F.2d at 891.

### CONSORTI

The jury awarded $20,550,161 to the Consortis, a verdict that each of the defendants attack on a variety of grounds. Except as set forth below, the motions to set aside the verdict are denied.

### *The Jury Verdict Was Not Tainted*

On July 30, over a month after the jury verdicts were returned, the court received a letter from one of the jurors, Carl D'Andrilli. The letter is set forth in full as Appendix E to this opinion. As soon as it was received it was forwarded to counsel. In view of the information contained in the letter and the strictures of Fed.R.Evid. 606(b), no further information was considered to be relevant and requests by defense counsel to take the deposition of D'Andrilli were denied.

D'Andrilli's letter reads, in pertinent part:

[O]n Friday July 23rd and Saturday July 24th, Mrs. Georgia Arnold, another juror, stated that Johns–Manville, a non-party defendant, possesses a one billion dollar fund to pay lawyer's fees to fight asbestos litigation cases. She made these remarks

to the jury while we were deliberating monetary awards in the Consorti and Pulizzi cases. She also mentioned this "fund" one other time, a few days before deliberations began.

I didn't know if this was general knowledge that a well-informed person could possess while serving as a juror dealing with well-publicized matters, or if it was improper.

\* \* \* \* \* \*

After the completion of the case on Saturday, jurors and lawyers were engaged in conversation outside the courtroom and later in front of the building. A lawyer commented to me that Mrs. Arnold had remarked that she was disappointed that the award wasn't larger. He asked me how much higher she desired to go. I answered probably much higher since she believed Johns–Manville was spending one billion to fight cases.

The information conveyed by Mrs. Arnold was, of course, extra-judicial. Johns Manville, its products, and the state of its knowledge had been the subject of testimony during the trial. Defense counsel had stated that Johns Manville was in bankruptcy, and, of course, Johns Manville was a non-party defendant which had not appeared in the action. The statement by Mrs. Arnold during the course of the trial troubled Mr. D'Andrilli according to his letter, but he did not raise the issue then or during the Consorti, Pulizzi, and Luchnick deliberations at a time when an appropriate instruction could have been given. The statement came to light only as a consequence of post trial discussions with defense counsel whose reactions caused Mr. D'Andrilli to be concerned enough first to call chambers and then ultimately to write. The issue thus surfaced as a result of the questioning and statements of defense counsel.

The jurors were instructed, more than once, that their verdict had to be based on the evidence adduced in the courtroom and that they must disregard any information which reached them from any source other than the witnesses and the exhibits. It must therefore be presumed that whatever her beliefs were, Mrs. Arnold's information was not evidence upon which any juror relied in reaching their verdict, particularly since Mrs. Arnold had mentioned her belief as an explanation of her disappointment that the verdicts rendered were not larger. *See Herring v. Meachum,* 11 F.3d 374, 378 (2d Cir.1993) (must presume jury follows instructions unless overwhelming probability they were unable to); *United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993) (same).

■ Given the notoriety of the Manville Fund litigation—the class settlement, *see In re Joint Eastern & Southern Districts Asbestos Litigation,* 129 B.R. 710 (E.D.N.Y.1991), its reversal by the Second Circuit, at 982 F.2d 721 (2d Cir.1992), and the publication of numerous stories in the New York Times and Wall Street Journal—any well-informed citizen could possess general knowledge about Johns Manville, *c.f., Government of Virgin Islands v. Dowling,* 814 F.2d 134, 138 (3d Cir.1987) (likelihood of prejudice from extra-record information depends on nature of information and manner in which it was conveyed). An expression of such "general knowledge" does not qualify as "extraneous prejudicial information" within the exception of Rule 606(b). *See Government of Virgin Islands v. Gereau,* 523 F.2d 140, 151 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976); *Pacific Employers Ins. Co. v. Orren,* 160 F.2d 1011 (5th Cir.1947).

In any case, the statement concerning Johns Manville was not prejudicial to these defendants. Certain jurisdictions have seemingly adopted a rebuttable presumption of prejudice standard, *see United States v. Howard,* 506 F.2d 865, 869 (5th Cir.1975), in the circumstance of "outside influence" improperly brought to bear upon a juror, *see Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532 (4th Cir.1986), when there is an improper communication from outside the jury room, from whatever source.

However, our Court of Appeals has not adopted such a rigid standard for the "extraneous information" circumstance but has left it to the district court to determine "the nature of what has been infiltrated and the probability of prejudice." *United States ex*

*rel. Owen v. McMann,* 435 F.2d 813, 818 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971). Indeed, it has stated "that the trial court's post-verdict determination of extra-record prejudice must be an objective one, measured by reference to its probable effect on 'a hypothetical average juror.'" *United States v. Calbas,* 821 F.2d 887, 896 n. 9 (2d Cir.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988). By that objective standard and based upon the factors already set forth, it is concluded that the extraneous information did not prejudice the jurors in such a fashion as to require a new trial.

■ A second basis of jury taint or improper prejudice has been raised. After the jury's verdict for plaintiff in excess of $13,-000,000 in the *Tabolt* case, the first special verdict submitted to the jury, and just prior to their discharge for the evening, the Court praised the jury for completing their deliberations in the first case and on the manner in which they had conducted themselves during both the trial and the deliberations, concluding, in an exercise of effusion, that it was "probably the best jury that has ever been put together in the United States of America." (Tr. at 4568, 7/22/93.) After the jury departed, and in response to objections promptly and properly raised by the defense, the Court stated that it would give a curative instruction the next morning and invited suggestions.

The next morning, just before the jury resumed deliberations on the remaining three cases, including *Consorti,* defendants made a motion for a mistrial based on the comment made by the judge to the jury the night before. The Court denied the motion for a mistrial and clarified the comment to the jury:

> Last night just before we broke I told you that you were the best jury in the United States. Everybody agrees with that proposition.
>
> However, I wanted to be clear that since you have entered a verdict in one case that I was referring, of course, not to the verdict in any way, about which I have no control, that is entirely in your hands, but, rather, in the way in which you conducted

yourselves, the attention that you have spent, your diligence in being here on time and all of those matters. It's the way in which you have conducted yourself, not the verdict itself.

> As far as I am concerned, I have nothing to do at this time with the verdict at all, and you are completely the masters and mistresses of the facts and it is entirely up to you.
>
> I am not going to repeat all of that portion of the charge in which I told you that it is your responsibility and my only responsibility is simply to advise you on the law. But I'm sure you recall that portion of the charge.
>
> I couldn't put it more strongly to you that I have no interest at this moment in how you decide the case, I was simply complementing [sic] you on the way in which you went about deciding the case.
>
> It's appropriate, also, I think at this point to remind you once again that you decided one case and you have decided it in a fashion that you feel is appropriate. That decision should not control as to any plaintiff or any defendant in any of the other cases.
>
> We recognize, of course, all of us, you, the lawyers, myself, that there are certain common aspects about the case and you may consider some of those common aspects in each one of the cases, but you mustn't, I would remind you, also, you mustn't consider anything in one case that I told you should be limited to another case.
>
> But I would just stress again, you have to decide the remaining cases with respect to each plaintiff with respect to each defendant with respect to each cause of action.
>
> I have stressed that in the past and I simply repeat that any decision which you made yesterday has no bearing on the decision which you make today.

(Tr. at 4574–75, 7/23/93.)

No additional or specific requests for further instructions were made. While the comments on the evening of July 22 were undoubtedly overly zealous positive reinforcement, the jury's obligations and the court's

were placed in the proper perspective the next morning before deliberations were resumed. Given the overall instructions as to the jury's function and the curative instruction, no basis for requiring a new trial for Consorti, Luchnick and Pulizzi has been established.

### Consolidation of the Consorti Case Was Appropriate

The opinions of February 12, 1993 and June 10, 1993 set forth the applicable criteria for consolidation, as recently repeated by the Second Circuit in *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir.1993), although those Opinions dealt with more cases than eventually went to trial. The applicability of the *Malcolm* factors has been discussed above.

### The Evidence Was Sufficient to Base a Verdict Against All the Defendants

■ Both Consorti and his brother testified to the identification of the asbestos products to which Consorti was exposed, and there is sufficient evidence to support the jury's verdict as to liability which is only seriously challenged by Porter Hayden and Atlas Turner.

Porter Hayden, a Maryland corporation, was principally an insulation contractor, and on occasion sold Johns Manville products, both asbestos-containing and non asbestos-containing. Typically, sales of products by Porter Hayden would be to customers as part of furnishing contracting services to industrial sites and facilities, and not to its competitors.

Porter Hayden sold products to one of Consorti's employers, State, for which he last worked in 1970. (Tr. at 1960–61, 7/7/93.) Porter Hayden and State had no further business dealings after 1970 or 1971 when there was a dispute over an outstanding account owed to Porter Hayden by State.

Although Consorti was on the State payroll from 1963 until 1970, he testified that he started working for State in 1968 and that he worked for both State and Veteran during this period. He also testified that during his employment with State he picked up materials at Porter Hayden's Newark facility.

There was no testimony by Consorti as to the asbestos content of the products that he obtained from Porter Hayden.

Peter Consorti, the brother of the plaintiff, testified that Consorti was exposed to asbestos-containing products supplied by Porter Hayden based in part upon Consorti's signature on some of the Porter Hayden invoices. However, these invoices did not refer to asbestos-containing products. Although Peter Consorti testified that he was "not too familiar with what went on with State Pipe Covering," he testified that Consorti was exposed to asbestos-containing products supplied by Porter Hayden while he was employed by State.

Although an effort was made to place Porter Hayden materials containing asbestos at a job site where Consorti worked (the Vulcan Materials site), the documents failed to support the contention. Consorti was left with Peter Consorti's testimony which cannot be said as a matter of law to have been insufficient to prove the presence of Porter Hayden products at State at a time when Consorti was employed there.

There was sufficient evidence to establish that Porter Hayden had, or should have had, knowledge of the dangerous characteristics of asbestos-containing products arising out of its treatment of the workers' compensation claims of its own employees. *See* Pl.'s Ex. PH 13.

Similarly, Peter Consorti is the source for the identification of asbestos products sold by Atlas Turner to State during the period that Consorti was working at State. While the 1978 break-in testimony which resulted in photographs of Atlas Turner products was unavailing to establish the use of such products by Consorti, particularly given the unchallenged testimony that Atlas Turner ceased using asbestos in its products after 1972, there is in the record the statement by Peter Consorti that State purchased Atlas Turner products containing asbestos during the relevant period. The statement is sufficient to support the jury verdict.

### The Record Supports the Jury Finding that Veteran Was Not Liable

■ Consorti was employed by the third-party defendant, Veteran Pipecovering, Inc.

("Veteran") from 1960 to 1963, and from 1970 to 1978, and the jury concluded that the evidence at trial demonstrated that no liability should be imposed on Veteran because it was not liable for failure to provide a safe work place as required by New York labor law, or as a supplier of asbestos-containing products.

New York Labor Law § 200 is the codification of the duty of owners and contractors to provide a safe workplace, *Monroe v. City of New York*, 67 A.D.2d 89, 414 N.Y.S.2d 718, 722 (1979), and Labor Law § 241(6) further imposes a non-delegable duty upon owners and contractors to provide "reasonable and adequate" protection to those lawfully at construction sites. To that end, worksites are required to be "constructed, shored, equipped, guarded, arranged, operated and conducted" so as to provide workers with proper protection. *Id.*

■ The New York Industrial Code, specifically 12 N.Y.C.R.R. §§ 12 & 23, implements and further defines New York labor law, and provides a further statutory basis for imposing liability upon Consorti's employers. *See DaBolt v. Bethlehem Steel Corp.*, 92 A.D.2d 70, 459 N.Y.S.2d 503, 506 (1983). A violation of these rules by an owner or contractor is evidence of negligence. *Allen v. Cloutier Constr. Corp.*, 44 N.Y.2d 290, 298, 405 N.Y.S.2d 630, 376 N.E.2d 1276 (1978).

Industrial Code Rule 12, 12 N.Y.C.R.R. 12 (Control of Air Contaminants) provided, as early as 1956, that five million particles of asbestos dust per cubic foot of air constitutes "prima facie evidence" of dangerous air contaminants on construction sites. *In re Joint E. & S. Dists. Asbestos Litig. (Phase I, Powerhouse Cases)*, Memorandum and Order, Sept. 10, 1991, at n. 3; *see* 12 N.Y.C.R.R. § 12–3.1, tbl. II. This is New York's codification of the Threshold Limit Value ("TLV") first recommended by an organization of scientists in 1946. In 1959, Rule 23 was extended to impose a duty to provide a safe work place to employers, owners, contractors, and subcontractors in the construction industry. *In re Joint E. & S. Dists. Asbestos Litig. (Phase I, Powerhouse Cases)*, Memorandum and Order, Sept. 10, 1991, at n. 3; *see* 12 N.Y.C.R.R. § 23–1.5(a).

■ The duty to provide a safe work place at common law and under N.Y. Labor Law §§ 200 and 241(6) also encompasses the obligation to provide workers with safe tools and appliances. *See Pieczonka v. Pullman Co.*, 89 F.2d 353, 357 (2d Cir.1937) (adequacy of a sponge mask to protect sandblaster from silica decided upon common law principles). The duty to provide a safe worksite includes the duty to make reasonable inspections to detect dangerous conditions and hidden defects. *Monroe v. City of New York*, 67 A.D.2d 89, 414 N.Y.S.2d 718, 722–23 (1979).

■ Additionally, an owner has an obligation under N.Y.Labor Law § 200 to warn those lawfully on the premises of hidden dangers of which it knew or should have known. *Gasperino v. Larsen Ford, Inc.*, 300 F.Supp. 1182 (S.D.N.Y.1969), *aff'd*, 426 F.2d 1151 (2d Cir.), *cert. denied*, 400 U.S. 941, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970) (defendant as dealer knew or should have known from its experience of dangerous levels of carbon monoxide created by moving cars in its basement). The purpose of the common law, the Labor Law, and the Industrial Code was, and is, to protect workers from injuries and to eliminate dangerous conditions at worksites.

No testimony established that Veteran was aware of threshold limit values for the work place or measured dust levels or was aware of New York labor laws regarding the responsibility of an employer to comply with rules preventing air contamination or to provide, install, and maintain protective equipment for their employees.

There was no evidence presented with respect to the level of dust at any worksite for which Veteran had responsibility. Further, Veteran was not a supplier of asbestos products with knowledge of the dangerous propensities of the products being supplied or responsibility to learn their characteristics. Its situation in that regard differed markedly from Porter Hayden. The proof with respect to Veteran's knowledge did not equate its responsibility to that of a manufacturer.

### Mrs. Consorti Had An Appropriate Loss Of Consortium Claim

■ The New York State Court of Appeals decision in *Anderson v. Eli Lilly & Co.*,

79 N.Y.2d 797, 580 N.Y.S.2d 168, 588 N.E.2d 66 (1991), and the decision of this court in *Walsh v. Armstrong World Industries, Inc.,* 700 F.Supp. 783 (S.D.N.Y.1988), are controlling with respect to the validity of Mrs. Consorti's consortium claim since the tortious conduct alone, and not the resultant injuries, preceded the Consorti's marriage.

In *Anderson* the Court of Appeals held that since the wife's exposure to DES and her resultant injuries both occurred before the marriage, the husband's consortium claim had to be dismissed. Unlike the plaintiff in *Anderson,* Consorti was not injured (*i.e.,* he did not have mesothelioma) prior to his marriage. Indeed, at the time of their marriage, Consorti had no viable cause of action against these defendants.

In *Walsh,* the Honorable Raymond J. Dearie dismissed the consortium claim of the surviving spouse of an asbestos-related disease victim who was injured, and whose injury was manifest, at the time of the marriage.

In the case of William Croon, *In re Joint E. & S. Dists. Asbestos Litig.,* 1991 WL 85942, 1991 U.S. Dist. Lexis 6422 (S.D.N.Y. May 9, 1991), the Honorable Charles P. Sifton dismissed the consortium claim of a widow whose decedent developed mesothelioma while they were divorced, and prior to their subsequent remarriage. Indeed, the resultant injuries from which Mrs. Croon's loss arose—the mesothelioma—occurred between the Croon's marriages (yet decades after Mr. Croon's exposure to asbestos). Accordingly, Judge Sifton dismissed the consortium claim.

The time of injury, not the conduct, determines whether or not the consortium claim is barred.

### Inconsistency of Answers on the Consorti Special Verdict Form

█ In the charge delivered to the jury in this matter, the jurors were instructed that Mrs. Consorti, if she prevailed, would be entitled to recover for her non-economic damages for loss of consortium, and that these damages, if any, were to be awarded for Mr. Consorti's life expectancy with mesothelioma. (Tr. at 4496, 7/22/93.) In addition, the jurors were instructed that Consorti, if he prevailed, was entitled to recover sums of money which would justly and fairly compensate him for any pain and suffering which they found he would experience in the future. The jury was directed to indicate how long into the future his suffering will continue. *Id.* The jury also heard evidence to the effect that a man of Consorti's age had a life expectancy of 26.2 years. *Id.* at 4497.

In Question 5(b) of the special verdict form in the *Consorti* case, the jurors found that Consorti's pain and suffering would continue for nine months into the future. This response must be interpreted as indicating that the jury had found that Consorti's life expectancy with mesothelioma was nine months. In question 5(h) of the special verdict form in the *Consorti* case, the jury initially awarded Frances Consorti future non-economic damages for loss of consortium for a period of 27.6 years. Since the jury was instructed to award future non-economic damages for loss of consortium for Consorti's life expectancy with mesothelioma, their response to question 5(h) indicated that Consorti had a life expectancy with the disease of 27.6 years.

After the verdict was rendered in this case, but before the jury was discharged, plaintiffs' counsel advised the Court of the internal inconsistencies in the jury's determinations of Consorti's life expectancy with the disease. (Tr. at 4606–32, 7/24/93.) Over the defendants' objection, the Court recalled the jury, re-read the part of the jury charge concerning loss of consortium, and asked the jury to decide if they wanted to modify their original award. *Id.* This was done to provide the jury with the opportunity to correct these internal inconsistencies. After deliberation, the jury lowered the number of years for non-economic loss of consortium from 27.6 years to 26.2 years, which did not eliminate the internal inconsistencies in the answers on the special verdict form. The Court did not seek further clarification from the jury.

In *Auwood* and *Brooks, supra,* the Second Circuit held that, when faced with inconsistent answers on a special verdict form, the court must attempt to harmonize the answers, if this is possible under a fair reading of them. However, if there is no way to harmonize the jury's answers, the court must order a new trial.

In *Auwood,* the jury in an antitrust action found that the defendants had violated the plaintiffs' rights, but did not find that the plaintiffs had proven damages under the proffered theories. In response to a question asking what amount the plaintiffs had proven would fairly compensate them for actual losses sustained, however, the jury awarded a total of $75,000.00, labelling these damages as "nominal."

The trial court concluded that the jury could not have intended its award to constitute compensatory damages but only nominal damages, consistent with the label attached to them. The court then ruled that, as a matter of law, $75,000.00 was not nominal, and reduced the judgement to $3.00.

The Second Circuit held that, if there had been an interrogatory asking whether plaintiffs had proven any damages and the jury had answered "no," that answer would have been inconsistent with the answers specifying the dollar amounts of damage:

> With no apparent way to harmonize those answers, the court would not be entitled to enter a judgement favorable to the defendants simply because the "no" answer was consistent with another answer. Such a result does not reconcile the inconsistency, but simply overrules one inconsistent answer. Had such an irreconcilable inconsistency existed, the court should have granted a new trial as to damages.

*Auwood,* 850 F.2d at 891–92.

To enter a judgment that disregards any material jury finding abrogates the parties' rights under the Seventh Amendment to the United States Constitution. *Id.* at 890–91.

Similarly, in *Bernardini v. Rederi A/B Saturnus,* 512 F.2d 660 (2d Cir.1975), the Second Circuit found irreconcilable responses to a special verdict form that declined to find a vessel unseaworthy and yet found the shipowner guilty of negligence. The court stated that "when special verdicts cannot be reconciled ... the court may not enter a judgement." *Id.* at 662; *see also Brooks v. Brattleboro Mem. Hosp.,* 958 F.2d 525, 529 (2d Cir.1992); *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990); *Schaafsma v. Morin*

*Vermont Corp.,* 802 F.2d 629, 645 (2d Cir. 1986).

It is impossible to reconcile the jury's answers to Questions 5(b) and 5(h) of the special verdict form in the Consorti case. In an attempt to correct this inconsistency, defendants Owens Corning Fiberglas ("OCF") and Porter Hayden suggest that the jury's findings with regard to Mrs. Consorti's future non-economic damages be converted into a ratio. Rather than awarding Mrs. Consorti $4,000,000.00 for 26.2 years, in other words, these defendants would interpret the jury's findings as awarding Mrs. Consorti $4,000,-000.00 *per* 26.2 years, a calculation which reduces these damages to either $114,286.00, (Porter Hayden's Mem. on Verdict Molding at 22), or $114,504.00, (OCF Mem. on Verdict Molding at 22). Under the precedents of this Circuit discussed above, however, this Court is not to so modify the jury's responses.

Ordinarily, this might require a new trial both on the issue of Mrs. Consorti's future non-economic loss of consortium and of Consorti's future pain and suffering, since the jury's answers on these issues are in conflict. However, the jury's findings with regard to Mrs. Consorti's future non-economic damages for loss of consortium shall be set aside as against the weight of the evidence. There is no reason, therefore, to disturb the jury's findings with regard to Mr. Consorti's future pain and suffering.

Under Fed.R.Civ.P. 59, a new trial may be granted if the verdict of the jury is so strongly against the weight of the evidence that it may be characterized as a "seriously erroneous result." *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992); *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988); *Flynn v. Goldman, Sachs & Co.,* 836 F.Supp. 152 (S.D.N.Y.1993).

At trial, the jury in the Consorti case heard testimony that Consorti's normal life expectancy, without mesothelioma, was 26.2 years. This information was reiterated in the jury charge. (Tr. at 4497, 7/22/93.) There was no evidence upon which the jury could have found that Consorti's life expectancy was unchanged with mesothelioma. More likely, the jury misunderstood their

responsibilities and awarded Mrs. Consorti damages for the period of Consorti's life expectancy without mesothelioma. Since the jury's finding that Consorti's life expectancy with mesothelioma was 26.2 years for purposes of determining Mrs. Consorti's damages for future non-economic loss of consortium is strongly against the weight of the evidence, it is a "seriously erroneous result." A new trial must be held on the issue of Mrs. Consorti's future non-economic damages for loss of consortium. This result has the additional effect of eliminating the inconsistency in the jury's findings.

### Remittitur Is Required With Respect To The Award Of Economic Damages For Future Consortium

The standards discussed above, when applied to the awards made by the jury for pain and suffering, indicate the jury's finding was consistent with those considered by Judge Sifton and the conclusions here previously reached, as is the award for the loss of past consortium. However, the award for economic damages for loss of future consortium must be reduced to $750,000, applying the *Maiorana* and *Didner* standards.

### The Evidence Failed To Establish Consorti As A "Sophisticated User" And Thereby Comparatively Negligent

The defendants claim that Consorti, as a pipecoverer, should have been charged with the knowledge of similarly trained and skilled pipecoverers, thereby allowing them to argue the applicability of New York's "sophisticated user" defense. The "sophisticated user" or "knowledgeable user" defense focuses on proximate cause, which is a necessary predicate to finding liability. Proximate cause can not be found when the plaintiff is a knowledgeable user who is actually aware of the dangerous nature of the product supplied. *See Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir.), *vacated*, —— U.S. ——, 112 S.Ct. 39, 116 L.Ed.2d 18, *and reinstated*, 952 F.2d 652 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2992, 120 L.Ed.2d 869 (1992); *Belling v. Haugh's Pools Ltd.*, 126 A.D.2d 958, 511 N.Y.S.2d 732, 733 (App.Div.), *app. denied*, 70 N.Y.2d 602, 518 N.Y.S.2d 1024, 512 N.E.2d 550 (1987).

As pointed out in *Andrulonis*, however, the "knowledgeable user exception" involves a subjective test: whether the particular user was aware of the danger. *Andrulonis*, 924 F.2d at 1222; *see also Kerr v. Koemm*, 557 F.Supp. 283, 287 (S.D.N.Y. 1983). This is in contrast to a supplier's duty to warn, which arises if he or she knows or should have known of a potential danger. *See Andrulonis*, 924 F.2d at 1223.

In the present case, there was no showing that Consorti in fact had knowledge of the dangerous properties of asbestos-containing materials. Refusal to charge him with the knowledge of similarly trained and skilled pipecoverers was proper.

### The Summary Evidence Proffered By OCF Was Properly Excluded

OCF proffered a summary of invoices of asbestos-containing products contained in boxes held by third-party defendant Veteran, Consorti's employer between the years 1965 and 1978. The proffer included the summary testimony and exhibits of Christopher Barry ("Barry"), a certified public accountant. The invoices were obtained from Veteran in the ordinary course of discovery, and comprised the existing available documentation of purchasing by Veteran and State. Twenty-six thousand items, including invoices, checks, and daily work logs, were admitted into evidence *en masse*.

In order to determine which products were asbestos-containing, Barry relied upon descriptions in the invoices themselves and information provided by a paralegal at Tucker, Biegel & Goldstein, counsel for OCF. A computerized list of products containing asbestos, which was the source of the information provided by the paralegal, had been generated from interrogatories, admissions of defendants in asbestos litigation, and product guides produced by defendants. Based upon this information, Barry created the summary evidence in the form of charts and graphs which were marked for identification by OCF but were not admitted into evidence. The Court, over objection by OCF, excluded the summary charts and graphs and severely limited Barry's testimony. The summary evidence was excluded on two grounds: 1) the

records may not have comprised the universe of Veteran documents, and 2) the basis of the exclusion of certain invoices from the summaries was unclear.

The proffered summary did not deal with all 26,000 documents; nor with all of the 2000–3000 invoices that were said to have been contained therein. The subject summary was predicated on 1105 invoices that the witness concluded related to asbestos-containing products. Since this conclusion, and hence the summary itself, was based in part upon the "data base," it contained information not present in and not taken solely from the underlying proof, *see United States v. Scales,* 594 F.2d 558, 561–63 (6th Cir.), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979), and was thus inadmissible, *see, e.g., Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 301 (3d Cir.1961). In short, it did not "fairly represent" the underlying documents, but summarized only those documents that, according to the witness, dealt with asbestos. *See Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir.1985). The computerized list was not introduced nor was it made available in court or for review and inspection by counsel for Consorti. In the absence of the list and any testimony concerning its preparation, the summary based upon it became inadmissible. *See United States v. King,* 616 F.2d 1034, 1041 (8th Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980); *Gordon v. United States,* 438 F.2d 858, 876–77 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971).

### The Finding Of Concerted And Reckless Action By The Defendants Was Supported By The Evidence

 The defendants do not challenge the instructions to the jury with respect to concerted and reckless action on the part of the defendants but rather claim that the evidence was insufficient to support the finding.

Atlas Turner, Fibreboard, Flintkote, Keene, and OCF were affiliated with industry trade associations that shared knowledge concerning the hazards of asbestos, and acted collectively to promote their common interest. These proofs alone were sufficient to support the jury's findings.

Concerted action is well illustrated by the New York Court of Appeals in *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982), where—in considering a concert of action liability problem in the context of DES cases—the Court said:

> The clearest example of concerted action liability is the drag race. Where two drivers agree to race and one collides with and injures a third party, the other driver is fully responsible for the third party's injuries even though there was no contact between that driver's car and the injured person.

*Id.* at 581, 450 N.Y.S.2d 776, 436 N.E.2d 182.

In this example there was no shared intent or agreement to strike the pedestrian, just the concerted improper conduct, sufficient in fact to impose liability even on a vehicle which normally would have a valid proximate causation defense. *See also De Carvalho v. Brunner,* 223 N.Y. 284, 119 N.E. 563 (1918).

In the instant cases the supply of raw asbestos, the manufacture of asbestos products, and the promotion, sale and distribution of those products, all jointly undertaken without adequate warnings, was the knowing action taken in concert participated in by the defendants that formed a sufficient basis for the jury's findings.

The record contains evidence that both OCF and Porter Hayden were aware of the dangers of asbestos inhalation prior to the time that Consorti began working with their products and that neither company provided warnings or took any action with respect to these perceived dangers until 1973. On this evidence and the state-of-the art evidence the jury was entitled to conclude that the defendants were reckless.

### LUCHNICK

### There Is Sufficient Evidence To Support The Verdict

 Neither Fibreboard nor Keene have seriously challenged the evidence that established that their products were being used during the period that Luchnick was working at the Brooklyn Navy Yard. Fibreboard has questioned the sufficiency of the evidence with respect to one of the elements of the

design defect cause of action, namely, the feasibility of designing the product in a safe manner. However, the evidence is undisputed that after 1972 just such design changes were accomplished by all the manufacturers. In addition, the record does contain evidence of consideration of materials to substitute for asbestos prior to that period. From this evidence and the lack of any evidence to the contrary it was appropriate for the jury to infer that a feasible substitute was available. No challenge has been made to the instructions to the jury, but only to the evidence which for the reasons indicated was sufficient.

 Fibreboard contends in addition that, even if the plaintiffs presented sufficient evidence of an alternative feasible design, the military contractor defense precludes a finding of liability against them under a design defect theory. Under the military contractor defense, a supplier cannot be liable for design defects in goods supplied to the military if the United States approved reasonably precise specifications for the products, the material conformed to those specifications, and the supplier warned the United States about the dangers in the use of the materials that were known to the supplier but not to the United States. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988); *In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dists. Asbestos Litig.)*, 971 F.2d 831, 839 (2d Cir.1992); *In re Joint E. & S. Dists. New York Asbestos Litig.*, 897 F.2d 626, 629 (2d Cir.1990). The Court instructed the jury on the military contractor defense. (Tr. at 4475, 7/22/93.) Once established, the military contractor defense is a complete defense to a design defect claim. *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518.

 The defendant bears the burden of proof with respect to each element of the defense. *Beaver Valley Power Co. v. National Eng'g & Contracting Co.*, 883 F.2d 1210, 1217 n. 7 (3d Cir.1989); *Deniston v. Boeing Co.*, 1990 WL 37621 at *3, 1990 U.S.Dist. LEXIS 3509, at *9 (N.D.N.Y. March 28, 1990); *Zinck v. ITT Corp.*, 690 F.Supp. 1331, 1338 (S.D.N.Y.1988). The jury

was instructed that the defendants had this burden. (Tr. at 4475, 7/22/93.)

 In the present case, the jury determined that Fibreboard did not meet its burden of proof regarding the military contractor defense. Fibreboard presented no evidence that it attempted in any way to find out what the United States Government knew about the dangers in the use of asbestos, or that it attempted in any way to warn the Government about these dangers. The jury's rejection of this defense, therefore, is not without support in the record.

The record contained testimony from those who had worked on the ships on which Luchnick had worked that Fibreboard products had been used on those ships. That evidence was sufficient to base an inference that Luchnick had inhaled dust from Fibreboard products.

 Fibreboard also defended against Luchnick's claims by asserting that his mesothelioma resulted from his use of Kent Micronite cigarettes, manufactured by Lorillard, which used filters that contained asbestos. The jury failed to find that the cigarettes were a proximate cause of Luchnick's contraction of the disease that was responsible for his death. In view of the absence of any evidence as to the period when the cigarettes containing asbestos were on the market, it was well within the purview of the jury to conclude that the defense was not established that the asbestos to which Luchnick was exposed came from the cigarettes.

### *Remittitur Is Required With Respect To The Award Of Damages For Loss Of Consortium*

For the reasons previously set forth, the jury award for damages with respect to pain and suffering is within the parameters which have been determined to be applicable. The award for loss of consortium for the reasons already set forth should be reduced to $500,-000.

### *PULIZZI*

The determinations set forth above dispose of the issues raised with respect to Pulizzi, whose case was comparable to Luchnick's

except for the cigarette defense and an excessive loss of consortium award.

## JUDGMENT MOLDING

### Article 16 of the N.Y.C.P.L.R.

 N.Y.C.P.L.R. § 1601(1) provides that when a plaintiff wins a suit for personal injuries against multiple tortfeasors, each tortfeasor who is 50% or less responsible for the plaintiff's injuries is not liable for more than its assessed share of noneconomic damages. This limitation does not apply, however, if the defendant was found to have acted either recklessly, N.Y.C.P.L.R. § 1602(7), or knowingly or intentionally and in concert with others to cause the acts or failures upon which the liability is predicated, N.Y.C.P.L.R. § 1602(11). In light of the above treatment of the jury's findings with regard to recklessness and action in concert, Article 16 is inapplicable to the present cases.

### N.Y.G.O.L. § 15–108

 As an initial matter, the jury was correctly instructed that the defendants had the burden of proof on the issue of allocation of responsibility. See In re Joint E. & S. Dists. Asbestos Litig., 741 F.Supp. 50, 51 n. 2 (E.D.N.Y.1990). Flintkote's assertion to the contrary, relying on Hill v. St. Clare's Hospital, 67 N.Y.2d 72, 499 N.Y.S.2d 904, 490 N.E.2d 823 (1986), is unavailing.

Hill involved successive, rather than joint tortfeasors.[3] The Court of Appeals therein held that, when a plaintiff releases an original tortfeasor from all claims including claims related to the aggravation of the injury due to the actions of successive tortfeasors, the successive tortfeasors have a right to a set off under N.Y.G.O.L. § 15–108 for the portion of the amount paid by the original tortfeasor for release from the claims relating to the aggravation of the injuries.

In Hill, the successive tortfeasor was liable for the aggravation, but not for the original injury. Because the injured party and the original tortfeasor, by stipulating to the allocation of the settlement monies between original injury and the aggravation, were permitted to stipulate to the amount by which the liability of the successive tortfeasor was to be reduced by the original tortfeasor's payment, the court held that it was the plaintiff's burden to prove what portion of the settlement payment was for the aggravation injuries. This rule is inapplicable to the present case, involving joint, rather than successive tortfeasors.

The defendants contend that, if the plaintiff has received any money from any entities who were not on the verdict sheet, they are entitled to a separate credit for such payments under N.Y.G.O.L. § 15–108. In Williams v. Niske, 81 N.Y.2d 437, 599 N.Y.S.2d 519, 615 N.E.2d 1003 (1993), the New York Court of Appeals considered this precise issue in an action for personal injuries brought against multiple defendants. One year prior to the trial, the plaintiffs settled with four of the defendants. No proof was offered at trial with respect to the percentage fault of these defendants, and thus there was no assessment of their equitable share of the damages. It was impossible, therefore, to make a comparison between equitable share and actual settlement payment with respect to these defendants. The plaintiffs argued in Williams, as do the plaintiffs in the present case, that the set off for purposes of § 15–108 should be computed by aggregating the settlement payments and allocations of fault of all settling defendants.

The Court of Appeals rejected this method, finding that it created a false comparison since, in fact no equitable share had been determined as to the defendants who had settled prior to trial. The Court found that this had the practical effect of depriving the nonsettling defendant of all credit for the pretrial settlements. See id. at 444, 599 N.Y.S.2d 519, 615 N.E.2d 1003. The Court adopted a two-step process for computing § 15–108 credits. In the first step all pretrial payments are subtracted from the verdict. The statutorily-required comparison between settlement payments and allocations of liability is then completed for the defendants for whom the jury had the opportunity

---

3. The court held that G.O.L. 15–108 applies to successive, as well as joint tortfeasors. See Hill, 67 N.Y.2d at 83, 499 N.Y.S.2d 904, 490 N.E.2d 823.

to allocate fault. *Id.* at 441–45, 599 N.Y.S.2d 519, 615 N.E.2d 1003.

■ The method adopted by the Court of Appeals in *Williams* will be employed in the present case. As in *Williams,* the jury made no findings regarding the liability of certain parties from whom the plaintiffs received settlement payments. These settlement payments must be deducted from the verdict award prior to determining the amount of any further § 15–108 reductions due to settlements with parties for whom the jury has made a finding of percentage liability.

■ The defendants also contend that, for those defendants to whom the jury did allocate a percentage of responsibility, they should be allowed to apply § 15–108 on a tortfeasor-by-tortfeasor basis. Plaintiffs, on the other hand, claim that the defendants are entitled to an offset of the greater of the aggregated amounts paid to them in settlement or the aggregated percentage shares of the settling tortfeasors. At the time that this issue was briefed by the parties, there had been no definitive statement on this issue from the New York Court of Appeals.

Since the time that the parties submitted their briefs the Court of Appeals has spoken directly on this issue. *In re New York County Asbestos Litig.,* 82 N.Y.2d 342, 604 N.Y.S.2d 884, 624 N.E.2d 979 (1993), involved an appeal by a nonsettling defendant in a multi-defendant tort action arising out of the plaintiff's decedent's exposure to asbestos. Several of the defendants had settled prior to trial. The Court of Appeals addressed directly the question:

[N]ot answered by the plain language of the statute ... [of] [w]hich method for computing the amount of G.O.L. § 15–108(a) offset to the jury award should be adopted: 1) the case-by-case method, under which each settling defendant is taken separately and for that defendant, the amount of the settlement or the amount of the corresponding apportioned share, whichever is higher, is deducted from the verdict; or 2) the aggregate method, in which the settling tortfeasors are viewed collectively, the settlement amounts and the corresponding apportioned shares are totaled, and the offset is allowed for the greater of the two totals.

*Id.* 604 N.Y.S.2d at 885, 624 N.E.2d at 980.

The Court of Appeals adopted the aggregate method, whereby the verdict is reduced either by the total of the dollar amounts to be paid by the settling defendants or the total dollar amounts of their corresponding shares of the verdict, allocated in accordance with their apportioned liability, whichever is greater. *See also Pollicina v. Misericordia Hosp. Med. Ctr.,* 82 N.Y.2d 332, 604 N.Y.S.2d 879, 624 N.E.2d 974 (1993).

■ Federal courts are bound by the interpretation placed upon a state statute by the state's highest court. *O'Brien v. Skinner,* 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974); *Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Dunleavy v. Wilson,* 397 F.Supp. 670, 673 n. 13 (S.D.N.Y. 1975). As the New York Court of Appeals has now spoken on this issue, this Court is bound by their determination. With regard to the settling defendants for whom a percentage share of liability was determined by the jury, the defendants in the present case are entitled to the greater of the aggregate dollar settlements received or to be received by the plaintiffs from these defendants or the aggregate amounts of these defendants' corresponding shares of the verdict, allocated in accordance with their apportioned liability, which ever is greater.

### Reallocation of Shares of Fault of Absent Parties

■ The jury in these cases allocated shares of fault to certain parties who were dismissed prior to trial, who were served but defaulted, who were not sued by the plaintiffs, or who are currently protected from suit by the bankruptcy statutes, parties which were referred to collectively as the "Non–Party Defendants." Several of the defendants contend that the shares of fault attributable to these parties should be redistributed among the settling and non-settling defendants according to their allocations of fault as determined by the jury.

However, established case law is to the contrary. In *In re Eastern & Southern Districts Asbestos Litigation,* 772 F.Supp. 1380 (E.D.N.Y.1991), Judge Weinstein considered the question of whether N.Y.G.O.L. § 15–108 requires a verdict to be reduced by the shares of fault attributed to bankrupt or nonparty fault-sharers.

The court noted the weight of authority from a variety of jurisdictions in holding that the shares attributed to insolvent or otherwise unavailable parties should be absorbed by the non-settling defendants, and held that both equity and the law of New York dictated this result in this jurisdiction. *Id.* at 1402–03. In upholding this decision, the Second Circuit noted that nonsettling defendants who are allocated shares of the liability of absent parties retain the right to pursue reimbursement under Article 14 of the N.Y.C.P.L.R. *In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.),* 971 F.2d 831, 845 (2d Cir.1992); *see also In re New York City Asbestos Litig.,* 188 A.D.2d 214, 593 N.Y.S.2d 43 (N.Y.1993) (reversing trial court's allocation of bankrupt defendants' shares of liability among both settling and nonsettling defendants and noting that non-settling defendants could seek relief through contribution actions), *aff'd,* 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993). The shares of liability allocated to the non-party defendants in the present case, therefore, will be re-allocated only among the non-settling defendants.

### Interest on N.Y.G.O.L. Reductions

■ In *In re Brooklyn Navy Yard Asbestos Litig. (Joint Eastern & Southern Districts Asbestos Litigation),* 971 F.2d 831, 852 (2d Cir.1992), the Second Circuit affirmed a computation of pre-judgment interest under N.Y.E.P.T.L. § 5–4.3(a) prior to subtracting N.Y.G.O.L. § 15–108 reductions. Since the decision in *Brooklyn Navy Yard,* however, the New York Appellate Division decided *In re New York City Asbestos Litigation,* 188 A.D.2d 214, 225, 593 N.Y.S.2d 43 (N.Y.1993), *aff'd,* 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993). There, the Appellate Division held that "the calculation of interest from the date of death based upon the net verdict (as reduced for settlements pursuant to General Obligations Law § 15–108) is entirely consistent with the language of EPTL 5–4.3." *See also Frey v. Chester E. Smith & Sons, Inc.,* 751 F.Supp. 1052, 1055–56 (N.D.N.Y.1990) (interest calculated for purposes of E.P.T.L. § 5–4.3(a) after deducting amounts to which recovering plaintiff is not entitled); *accord Duffy v. New York,* 7 A.D.2d 988, 183 N.Y.S.2d 863, 864 (1959) (interest should be calculated on difference between verdict and settlement amount) (interpreting Decedent Estate Law § 132, later re-enacted as E.P.T.L. § 5–4.3).

■ The New York Court of Appeals has affirmed the opinion in *In re New York City Asbestos Litigation* for the reasons stated therein. *See* 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993). As this decision now represents the position of New York's highest court on this issue of New York statutory law, it is binding on this court. *O'Brien v. Skinner,* 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974); *Commissioner v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Dunleavy v. Wilson,* 397 F.Supp. 670, 673 n. 13 (S.D.N.Y.1975). When a conflict exists between holdings of the Second Circuit and more recent determinations of state appellate courts, the interpretation of the Circuit is not binding on federal district courts. *In re E. & S. Dists. Asbestos Litig.,* 772 F.Supp. 1380, 1391 (E.D.N.Y.1991).

In addition to the decisional law that contradicts the holding of the Second Circuit, it would be inequitable to require the non-settling defendants to pay interest on damages for which they were not responsible. Interest will be calculated in this case on the judgment after the deductions mandated by N.Y.G.O.L. § 15–108. Pre-verdict interest on an award for past losses that have accrued from the date of death to the date of the verdict will be calculated either on each item of damage from the date it was incurred or on all of such damages from some reasonable intermediate date, as prescribed in N.Y.C.P.L.R. 5001(b). *See Milbrandt v. A.P. Green Refractories Co.,* 79 N.Y.2d 26, 580 N.Y.S.2d 147, 588 N.E.2d 45 (1992).

*N.Y.C.P.L.R. § 5041*

Several issues are presented with regard to the application of New York's "nightmare"[4] statute, N.Y.C.P.L.R. § 5041. This statute prescribes the method for determining what judgment is to be entered on a verdict in an action to recover damages for personal injury or wrongful death under New York Law. Section 5041(e), which governs awards of future damages in excess of two hundred fifty thousand dollars, requires the defendant to purchase an annuity contract that will provide for the payment of such damages in periodic installments. Once the annual payment for the first year has been calculated, this subsection requires that the payments due in each succeeding year be computed by adding 4% to the previous year's payment.

Subsection 5041(c) requires that attorney's fees related to future periodically paid damages be paid in a lump sum based on the present value of the annuity contract purchased pursuant to subsection 5041(e).

When interpreting a state statute on which the state's highest court has not spoken, federal courts must give "proper regard" to the relevant rulings of state trial courts. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). The New York Supreme Court has interpreted the calculation of attorney fees under Section 5041(c) to include the four percent annual increases required by Section 5041(e). *See, e.g., Marulli v. Pro Sec. Serv., Inc.*, 151 Misc.2d 1077, 583 N.Y.S.2d 870, 872 (Sup.Ct.App.Term 1992); *Ursini v. Sussman*, 143 Misc.2d 727, 541 N.Y.S.2d 916, 918 (Sup.Ct.1989).

This interpretation also comports with the language of the statute. Section 5041(c) provides that attorney's fees must be based on the present value of the annuity contract purchased to provide payment of future periodically paid damages pursuant to Subsection

5041(e). The annuity contract required by Subsection 5041(e) must be adequate to provide payments that include the 4% annual augmentations. In light of the opinions of the state courts interpreting this state statute and the congruence of this interpretation with the language of the statute, the calculation of attorney fees required by Subsection 5041(c) in this case will include the 4% annual increases required by Subsection 5041(e).

*The Discount Rate to be Applied in Annuity Calculations*

N.Y.C.P.L.R. § 5041(e) provides that, with respect to future damages in excess of two hundred fifty thousand dollars:

> [T]he court shall enter a judgment for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments. The present value of such contract shall be determined in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages....

The parties in this action disagree with respect to the discount rate to be applied pursuant to Section 5041 and with respect to whether a different discount rate should be applied to each year of payment under the annuities or a fixed discount rate should be applied, ranging from 3.3% to 8.21% based on a variety of evidence such as prior reported cases, or averages of discount rates from the prior 14 years.

Section 5041 does not establish the discount rate that is to be used to reduce judgments of future damages to present value. Rather, it is left to individual courts to determine an appropriate rate. The Federal Government establishes a discount rate monthly through the Secretary of the United States Treasury Department who is required during each calendar month to determine the Feder-

---

4. That Section 5041 is "every judge's nightmare" is a refrain iterated, Poe-like, by judges from a variety of courts. *See, e.g., Singletary v. Three City Ctr.*, 601 N.Y.S.2d 649, 650 (Sup.Ct.1993); *Rohring v. City of Niagara Falls*, 153 Misc.2d 1001, 584 N.Y.S.2d 513, 515 (Sup.Ct.1992); *Daversa v. P.T.C. Props. Inc.*, 157 Misc.2d 854, 599 N.Y.S.2d 432, 434 (Civ.Ct.1993); *Sales v. Republic of Uganda*, 828 F.Supp. 1032, 1041 (S.D.N.Y. 1993); *In re Joint E. & S. Dists. Asbestos Litig.*, 798 F.Supp. 940, 961 (E.D.N.Y.1992), *rev'd*, 995 F.2d 343 (2d Cir.), *and rev'd*, 995 F.2d 346 (2d Cir.1993).

al short-term, mid-term and long-term rate which will apply during the following calendar month, *see* 26 U.S.C. § 1274(d)(1)(B), which is based on the average market yield during any one-month period ending in the calendar month in which the determination is made on outstanding marketable obligations of the United States with remaining periods to maturity of appropriate periods, 26 U.S.C. § 1274(d)(1)(C).

The applicable Treasury Department rate is used by the Federal Government as a discount rate to determine whether a debt instrument given in consideration for the sale or exchange of property bears adequate stated interest, 26 U.S.C. § 1274(b)(2), and for the determination of the present values of future payments on the sale or exchange of property, 26 U.S.C. § 483(b), among other things. Several cases have used this rate as a guide when determining the appropriate discount rate for purposes of Section 5041. *See, e.g., Sales v. Republic of Uganda,* 828 F.Supp. 1032, 1047 n. 18 (S.D.N.Y.1993); *Peterson v. Zuercher,* 152 Misc.2d 684, 584 N.Y.S.2d 968, 971–72 (Sup.Ct.1992).

The short-term rate is the "applicable Federal rate" for debt instruments with a term of not over three years, the mid-term rate is the "applicable Federal Rate" for debt instruments with a term of over three years but not over nine years, and the long term rate is the "applicable Federal rate" for debt instruments with a term of over nine years. 26 U.S.C. § 1274(d)(1)(A).

The federal short-term rate for July, 1993, the month that the jury verdicts were announced in the present cases, ranged from 3.88% to 3.89% to 3.91% to 3.95%, depending on the compounding period. The federal long-term rate for July, 1993, ranged from 6.41% to 6.45% to 6.50% to 6.61%, depending on the compounding period. *See* I.R.S.Rev. Rul. 93–42, 1993–24 I.R.B. 57 (July 6, 1993). A discount rate of 3.91% will therefore be used for purposes of Section 5041 with regard to the determination of present values for loss periods of less than three years, and a rate of 6.49% will be used for purposes of

Section 5041 with regard to the determination of present values for loss periods of more than nine years.[5]

These rates comport with a number of recent cases considering this issue. *See, e.g., Sales,* 828 F.Supp. at 1047 n. 18 (using U.S. Treasury discount rates for February and March, 1993, to establish 6% discount rate); *Doe v. State,* 189 A.D.2d 199, 595 N.Y.S.2d 592 (1993) (6% discount rate); *Andrialis v. Snyder,* 603 N.Y.S.2d 670 (Sup.Ct.1993) (same). In addition, these rates fall between the rates suggested by the plaintiffs and the defendants. *Compare* Pl.'s Rep.Mem. on Verdict Molding at 15 (suggesting rates between 3.3% and 6.17%) *with id.* at 14 (indicating that defendants have suggested rates ranging from 7% to 8.21%).

■ The parties also disagree regarding the calculations of the value of the annuities that must be purchased pursuant to Subsection 5041(e). This provision has been subject to conflicting interpretations by the lower New York courts. *See, e.g., Rohring v. City of Niagara Falls,* 192 A.D.2d 228, 601 N.Y.S.2d 740 (1993); *Ursini v. Sussman,* 143 Misc.2d 727, 541 N.Y.S.2d 916 (Sup.Ct.1989). The best approach is that applied by Justice Stander of the New York Supreme Court in *Singletary v. Three City Centre,* 601 N.Y.S.2d 649 (1993). Using *Singletary* as a guide, the application of § 5041 shall proceed as follows:

Starting with the jury's award for each element of future damages, net of the various set-offs described above, judgment in lump sum will be entered for future damages not in excess of $250,000.00. This lump sum judgment must "include the elements of future damages in the same proportion as such elements comprise of the total award for future damages." N.Y.C.P.L.R. § 5041(b).

The next step, determining attorney fees on future damages, encounters the oft-noted internal inconsistency in this Section. Subsection 5041(c) provides that these attorney fees must be "based on the present value of the annuity contract purchased to provide

---

5. There are no loss periods greater than three years and less than nine years in the present cases. *See* Pl.'s Rep.Mem. at 15.

payment of such future periodically paid damages pursuant to subdivision (e)" of Section 5041. However, the present value of the annuity contract can only be determined after calculation of, *inter alia*, attorney's fees. Thus, "[w]ere the statute to be literally interpreted it would not be possible to compute the attorney's fee until the present value of the annuity contract is determined and the present value of the annuity contract cannot be determined until the attorney's fee is calculated and deducted." *Marulli v. Pro Sec. Serv. Inc.*, 151 Misc.2d 1077, 583 N.Y.S.2d 870, 872 (Sup.Ct.App.Term 1992) (quoting *Ursini v. Sussman*, 143 Misc.2d 727, 731, 541 N.Y.S.2d 916 (N.Y.Sup.Ct.1989)). Consistent with the opinions of several New York State courts, this Gordian knot will be cut by performing two calculations: "[a] calculation of the attorney's fee based on a determination of the present value prior to the deduction of the attorney's fee and a second calculation to determine to future payments to the plaintiff after deduction of the attorney's fee." *Marulli v. Pro Sec. Serv. Inc.*, 151 Misc.2d 1077, 1079, 583 N.Y.S.2d 870 (Sup.Ct.App.Term 1992) (quoting *Ursini v. Sussman*, 143 Misc.2d 727, 731, 541 N.Y.S.2d 916 (N.Y.Sup. Ct.1989)).

**6.** As discussed *supra*, this will include the 4%

To arrive at the first amount, the attorney's fee on future, periodically paid damages in excess of $250,000.00, the future value of each plaintiff's net future damages award must be determined.[6] As indicated by the retainer agreements submitted by the plaintiffs' attorney, the attorney's fee is ⅓ of this future value amount. This future value of the attorney fees must then be converted to present value, using the discount rates prescribed above.

The second calculation will be performed as follows. The future value of the attorney's fee must be subtracted from the future value of the damages award to obtain the sum to be paid through future periodic payments to the plaintiffs. This amount must then be converted to present value pursuant to Subsection 5041(e) to determine the amount to be entered as judgment for the plaintiffs. The required annuity contract shall be purchased from any qualified insurer approved by New York's Superintendent of Insurance, subject to Court approval.

### *Conclusion*

Settle judgment on notice in accordance with this opinion within two weeks.

It is so ordered.

yearly increases required by Subsection 5041(e).

## APPENDIX A

July 22, 1993

### SPECIAL VERDICT FORM: TABOLT CASE

1. Were the asbestos-containing products manufactured by Flintkote defective or unsafe?

Yes __✓__ No _____

Proceed to Question 2.

2. Did Flintkote fail to use reasonable care in respect to the foreseeable use in preparing, marketing, or warning or failing to warn about its asbestos-containing product?

Yes __✓__ No _____

If you answered both Questions 1 and 2 "No", proceed to the STOP instruction at the end of this form. If you answered "Yes" to either or both Question 1 or Question 2, proceed to Question 3.

3. Was Vincent Tabolt exposed to Flintkote's asbestos-containing products?

Yes __✓__ No _____

If you answered "No" to this question, proceed to the STOP instruction at the end of this form. If you answered "Yes" to this Question, proceed to Question 4.

4. Was the exposure to Flintkote's asbestos-containing products a proximate cause of Vincent Tabolt's death?

Yes __✓__ No _____

If you answered "No" to this Question, proceed to the STOP instruction at the end of this form. If you answered "Yes" to this Question, proceed to Question 5.

5. State the damages, if any, resulting from the pain and suffering of Vincent Tabolt and wages lost before his death and Sharon Tabolt's claim for loss of consortium due to Vincent Tabolt's mesothelioma.

a) Vincent Tabolt's pain and suffering $ 7,500,000

b) Vincent Tabolt's lost wages prior to death $ 50,000

c) Sharon Tabolt's loss of consortium $ 3,750,000

Proceed to Question 6.

6. State the damages, if any, to Mrs. Tabolt arising out of Vincent Tabolt's death with respect to the following:

a) Funeral expenses $ 6,116

b) Wages which Vincent Tabolt would have contributed to his wife from death to the present. $ 22,000

c) Wages which Vincent Tabolt would have contributed to his wife from today for as long as he would have continued to work (undiscounted) $ 1,700,000
 How many years 2.2

d) Loss of services to Mrs. Tabolt from the time of his death to the present $ 5,600

e) Loss of services to Mrs. Tabolt in the future (undiscounted) $ 507,072
 Number of years 27.2

7. Were the asbestos-containing products manufactured by the following companies defective or unsafe?

a) A.P. Green Yes ✓ No_____
b) GAF Corporation Yes ✓ No_____
c) Armstrong World Ind. Yes ✓ No_____
d) Georgia-Pacific Yes ✓ No_____
e) Rutland Yes ✓ No_____
f) U.S. Gypsum Yes ✓ No_____
g) W.R. Grace Yes ✓ No_____

Proceed to Question 8.

8. Did the following companies fail to use reasonable care with respect to foreseeable use in producing, marketing, or warning about their asbestos-containing products?

| | | | |
|---|---|---|---|
| a) | A.P. Green | Yes ✓ | No ____ |
| b) | GAF Corporation | Yes ✓ | No ____ |
| c) | Armstrong World Ind. | Yes ✓ | No ____ |
| d) | Georgia-Pacific | Yes ✓ | No ____ |
| e) | Rutland | Yes ✓ | No ____ |
| f) | U.S. Gypsum | Yes ✓ | No . ____ |
| g) | W.R. Grace | Yes ✓ | No ____ |

If you answered "Yes" to either or both Questions 7 and 8, for any company listed proceed to Question 9. If you answered both Questions 7 and 8 "No" as to any company, strike that company from those listed at Question 11.

9. Was Vincent Tabolt exposed to the following companies' asbestos-containing products?

| | | | |
|---|---|---|---|
| a) | A.P. Green | Yes ✓ | No ____ |
| b) | GAF Corporation | Yes ✓ | No ____ |
| c) | Armstrong World Ind. | Yes ✓ | No ____ |
| d) | Georgia-Pacific | Yes ✓ | No ____ |
| e) | Rutland | Yes ✗ | No ✓ |
| f) | U.S. Gypsum | Yes ✓ | No ____ |
| g) | W.R. Grace | Yes ✓ | No ____ |

If you answered Question 9 "Yes" for any company listed, proceed to Question 10. If you answered Question 9 "No" for any company, strike that company from those listed at 11.

10. Did the exposure to the asbestos-containing products of any of the following companies proximately cause Vincent Tabolt's mesothelioma?

| | | | |
|---|---|---|---|
| a) | A.P. Green | Yes ✓ | No ____ |
| b) | GAF Corporation | Yes ✓ | No ____ |
| c) | Armstrong World Ind. | Yes ✓ | No ✗ |
| d) | Georgia-Pacific | Yes ✓ | No ____ |
| e) | Rutland | Yes ____ | No ✓ |
| f) | U.S. Gypsum | Yes ✓ | No ____ |
| g) | W.R. Grace | Yes ✓ | No ____ |

If you answered "No" to this Question for any company, strike that company from those listed at Question 13

unless it has already been stricken in accordance with these instructions. Proceed to Question 11.

11. Determine the percentage which represents the relative share of the responsibility of each entity arising out of Vincent Tabolt's mesothelioma. The total must be 100%. Do not assign a percentage to any company whose name has been crossed out in accordance with these instructions.

| | | | |
|---|---|---|---|
| a) | Flintkote | 21 | % |
| b) | A.P. Green | 19 | % |
| c) | GAF Corporation | 5 | % |
| d) | Armstrong World Ind. | 0 | % |
| e) | Georgia-Pacific | 15 | % |
| f) | Rutland | 0 | % |
| g) | U.S. Gypsum | 30 | % |
| h) | W.R. Grace | 10 | % |

Total 100%

12. Was the conduct of defendant Flintkote reckless disregard for the safety of others?

Yes ___✓___ No _____

13. Did defendant Flintkote act knowingly and in concert to cause the acts upon which any liability is based?

Yes ___✓___ No _____

**STOP:** Sign the form and advise the Marshal that you have reached a verdict.

_____
Foreperson

## APPENDIX B

### SPECIAL VERDICT FORM: CONSORTI CASE

1. Were the asbestos-containing products manufactured or distributed by any of the following companies defective or unsafe?

 a) Atlas Turner Yes ✓ No _____
 b) Fibreboard Yes ✓ No _____
 c) Keene Yes ✓ No _____
 d) Owens-Corning Fiberglas Yes ✓ No _____
 e) Porter-Hayden Yes ✓ No _____

 Proceed to Question 2.

2. Did any of the following companies fail to use reasonable care in respect to the foreseeable use in preparing, marketing, or warning or failing to warn about its asbestos-containing product?

 a) Atlas Turner Yes ✓ No _____
 b) Fibreboard Yes ✓ No _____
 c) Keene Yes ✓ No _____
 d) Owens-Corning Fiberglas Yes ✓ No _____
 e) Porter-Hayden Yes ✓ No _____

 If you answered both Questions 1 and 2 "No" for all defendants listed, proceed to the STOP instruction at the end of this form. If you answered both Questions 1 and 2 "No" as to any defendant(s), go to Questions 3, 4, 12, 13, and 14 and strike that defendant(s)' name from the list at each. If you answered "Yes" to either or both Question 1 or Question 2, for any defendant listed proceed to Question 3.

3. Was John Consorti exposed to the asbestos-containing products manufactured or distributed by the following companies?

 a) Atlas Turner Yes ✓ No _____
 b) Fibreboard Yes ✓ No _____
 c) Keene Yes ✓ No _____
 d) Owens-Corning Fiberglas Yes ✓ No _____
 e) Porter-Hayden Yes ✓ No _____

 If you answered "No" to this Question for all defendants listed proceed to the STOP instruction at the end of this form. If you answered "No" to this Question in regard to any defendant(s), go to Questions 4, 12, 13 and 14 and

1120

strike that defendant(s)' name from the list at each.
If you answered "Yes" to this Question for any defendant
listed, proceed to Question 4.

4. Was the exposure to any of the following companies'
asbestos-containing products a proximate cause of John Consorti's
mesothelioma?

| | | | |
|---|---|---|---|
| a) | Atlas Turner | Yes ✓ | No |
| b) | Fibreboard | Yes ✓ | No |
| c) | Keene | Yes ✓ | No |
| d) | Owens-Corning Fiberglas | Yes ✓ | No |
| e) | Porter-Hayden | Yes ✓ | No |

If you answered "No" to this Question for all defendants
listed, proceed to the STOP instruction at the end of
this form. If you answered "No" to this Question in
regard to any defendant(s), go to Questions 12, 13 and 14
and strike that defendant(s)' name from the list at each.
If you answered "Yes" to this Question for any defendant
listed, proceed to Question 5.

5. State the damages, if any, resulting from the pain and
suffering of John Consorti and wages lost and Frances Consorti's
claim for loss of consortium due to John Consorti's mesothelioma.

a) John Consorti's pain and suffering to date; $8,000,000

b) John Consorti's pain and suffering in the future; $4,000,000
How many years? 9 MONTHS

c) John Consorti's lost wages to date; $137,800

d) John Consorti's lost wages in the the future (undiscounted); $1,352,156
How many years? 14

e) Past medical expenses; $100,000

f) Future medical and funeral expenses; $47,500
How many years? 9 MONTHS

g) Frances Consorti's lost consortium to date; $2,000,000

h) Frances Consorti's lost consortium in the future:

912,705

Economic (gcm) $~~~~~~~~

How many years? (gcm) ~~~~ 14 yrs.

Non-Economic $4,000,000

How many years? (gcm) ~~~~ 26.2

Proceed to Question 6.

6. Were the asbestos-containing products manufactured or distributed by the following companies defective or unsafe?

| | | Yes | No |
|---|---|---|---|
| a) | American Insulation | ✓ | |
| b) | Anchor Packing Co. | ✓ | |
| c) | Combustion Engineering, Inc. | ✓ | |
| d) | Consolidated Edison of NY, Inc. | ✓ | |
| e) | Crown, Cork & Seal Co., Inc. | ✓ | |
| f) | Eagle-Pitcher Indus. Inc. | ✓ | |
| g) | Empire-Ace Insulation Mfg. Co. | ✓ | |
| h) | GAF Corporation | ✓ | |
| i) | General Dynamics Corporation | ✓ | |
| j) | Janos Asbestos Insulation Co. | ✓ | |
| k) | Johns-Manville Corporation | ✓ | |
| l) | King Insulation Co. | ✓ | |
| m) | New York Protective Co. | ✓ | |
| n) | New York Twine | ✓ | |
| o) | Nicolet, Inc. | ✓ | |
| p) | Owens-Illinois, Inc. | ✓ | |
| q) | Phillip Carey, Inc. | ✓ | |
| r) | Pittsburgh-Corning Corp. | ✓ | |
| s) | Robert A Keasbey Co. | ✓ | |
| t) | Richmond Co. | ✓ | |
| u) | Southern-Asbestos/H.K. Porter | ✓ | |
| v) | S.W. Anderson Inc. | ✓ | |
| w) | Standard Asbestos/Insulation | ✓ | |
| x) | State Insulation Co. | ✓ | |
| y) | U.S. Rubber,aka Uniroyal, Inc. | ✓ | |
| z) | Unarco | ✓ | |

Proceed to Question 7.

7. Did the following companies fail to use reasonable care with respect to foreseeable use in preparing, marketing, or warning or failing to warn about their asbestos-containing products?

| | | Yes | No |
|---|---|---|---|
| a) | American Insulation | ✓ | |
| b) | Anchor Packing Co. | ✓ | |

c) Combustion Engineering, Inc. Yes ✓ No _____
d) Consolidated Edison of NY, Inc. Yes ✓ No _____
e) Crown, Cork & Seal Co., Inc. Yes _____ No _____
f) Eagle-Pitcher Indus. Inc. Yes ✓ No _____
g) Empire-Ace Insulation Mfg. Co. Yes ✓ No _____
h) GAF Corporation Yes ✓ No _____
i) General Dynamics Corporation Yes ✓ No _____
j) Janos Asbestos Insulation Co. Yes ✓ No _____
k) Johns-Manville Corporation Yes ✓ No _____
l) King Insulation Co. Yes ✓ No _____
m) New York Protective Co. Yes ✓ No _____
n) New York Twine Yes ✓ No _____
o) Nicolet, Inc. Yes _____ No _____
p) Owens-Illinois, Inc. Yes ✓ No _____
q) Phillip Carey, Inc. Yes ✓ No _____
r) Pittsburgh-Corning Corp. Yes ✓ No _____
s) Robert A Keasbey Co. Yes ✓ No _____
t) Richmond Co. Yes ✓ No _____
u) Southern-Asbestos/H.K. Porter Yes ✓ No _____
v) S.W. Anderson Inc. Yes ✓ No _____
w) Standard Asbestos/Insulation Yes ✓ No _____
x) State Insulation Co. Yes ✓ No _____
y) U.S. Rubber,aka Uniroyal, Inc. Yes ✓ No _____
z) Unarco Yes ✓ No _____

If you answered "Yes" to either or both Questions 6 and 7, for any of the companies listed proceed to Question 8. If you answered both Questions 6 and 7 "No", for any company strike that company from the list at Questions 8, 9 and 12.

8. Was John Consorti exposed to the following companies' asbestos-containing products?

a) American Insulation Yes ✓ No _____
b) Anchor Packing Co. Yes ✓ No _____
c) Combustion Engineering, Inc. Yes ✓ No _____
d) Consolidated Edison of NY, Inc. Yes ✓ No _____
e) Crown, Cork & Seal Co., Inc. Yes _____ No _____
f) Eagle-Pitcher Indus. Inc. Yes ✓ No _____
g) Empire-Ace Insulation Mfg. Co. Yes ✓ No _____
h) GAF Corporation Yes ✓ No _____
i) General Dynamics Corporation Yes ✓ No _____
j) Janos Asbestos Insulation Co. Yes ✓ No _____
k) Johns-Manville Corporation Yes ✓ No _____
l) King Insulation Co. Yes ✓ No _____
m) New York Protective Co. Yes ✓ No _____
n) New York Twine Yes ✓ No _____
o) Nicolet, Inc. Yes _____ No _____
p) Owens-Illinois, Inc. Yes ✓ No _____
q) Phillip Carey, Inc. Yes ✓ No _____
r) Pittsburgh-Corning Corp. Yes ✓ No _____

s) Robert A Keasbey Co. ....... Yes__✓__ No_____
t) Richmond Co. ....... Yes__✓__ No_____
u) Southern-Asbestos/H.K. Porter ...... Yes__✓__ No_____
v) S.W. Anderson Inc. ....... Yes__✓__ No_____
w) Standard Asbestos/Insulation ...... Yes__✓__ No_____
x) State Insulation Co. ....... Yes__✓__ No_____
y) U.S. Rubber,aka Uniroyal, Inc. ...... Yes__✓__ No_____
z) Unarco ....... Yes__✓__ No_____

> If you answered Question 8 "Yes" for any of the companies listed, proceed to Question 9. If you answered Question 8 "No" for any company, strike that company from the list at Questions 9 and 12.

9. Did the exposure to the asbestos-containing products of any of the following companies proximately cause John Consorti's mesothelioma?

a) American Insulation ....... Yes__✓__ No_____
b) Anchor Packing Co. ....... Yes__✓__ No_____
c) Combustion Engineering, Inc. ...... Yes__✓__ No_____
d) Consolidated Edison of NY, Inc. ..... Yes__✓__ No_____
~~e) Crown, Cork & Seal Co., Inc.~~ ...... ~~Yes~~_____ ~~No~~____
f) Eagle-Pitcher Indus. Inc. ...... Yes__✓__ No_____
g) Empire-Ace Insulation Mfg. Co. ..... Yes__✓__ No_____
h) GAF Corporation ....... Yes__✓__ No_____
i) General Dynamics Corporation ...... Yes__✓__ No_____
j) Janos Asbestos Insulation Co. ...... Yes__✓__ No_____
k) Johns-Manville Corporation ...... Yes__✓__ No_____
l) King Insulation Co. ....... Yes__✓__ No_____
m) New York Protective Co. ....... Yes__✓__ No_____
n) New York Twine ....... Yes__✓__ No_____
~~o) Nicolet, Inc.~~ ....... ~~Yes~~_____ ~~No~~____
p) Owens-Illinois, Inc. ....... Yes__✓__ No_____
q) Phillip Carey, Inc. ....... Yes__✓__ No_____
r) Pittsburgh-Corning Corp. ....... Yes__✓__ No_____
s) Robert A Keasbey Co. ....... Yes__✓__ No_____
t) Richmond Co. ....... Yes__✓__ No_____
u) Southern-Asbestos/H.K. Porter ...... Yes__✓__ No_____
v) S.W. Anderson Inc. ....... Yes__✓__ No_____
w) Standard Asbestos/Insulation ...... Yes__✓__ No_____
x) State Insulation Co. ....... Yes__✓__ No_____
y) U.S. Rubber,aka Uniroyal, Inc. ...... Yes__✓__ No_____
z) Unarco ....... Yes__✓__ No_____

> If you answered "No" to this Question for any company, strike that company from the list at Question 12 unless it has already been stricken in accordance with these instructions.

> Proceed to Question 10.

**1124**

10. Did any of the following third-party defendants or non-party defendants listed below fail to use reasonable care in providing a safe workplace?

 a) Veteran Pipe Covering Yes_____ No ✓

 b) State Pipe Covering Yes_____ No ✓

 c) Marine Pipe Covering Yes_____ No ✓

If you answered this Question "No" as to any third-party or non-party defendant, strike the name of that party or non-party defendant from the list of defendants in Questions 11 and 12.

Proceed to Question 11.

11. Was the failure of the following companies to use reasonable care in providing a safe workplace a proximate cause of John Consorti's mesothelioma?

 a) Veteran Pipe Covering Yes_____ No ✓

 b) State Pipe Covering Yes_____ No ✓

 c) Marine Pipe Covering Yes_____ No ✓

If you answered this Question "No" as to any third-party or non-party defendant, strike the name of that party or non-party defendant from the list of defendants in Question 12.

Proceed to Question 12.

12. Determine the percentage which represents the relative share of the responsibility of each entity arising out of John Consorti's mesothelioma. The total must be 100%. Do not assign a percentage to any company whose name has been crossed out in accordance with these instructions.

| | | |
|---|---|---|
| a) | Atlas Turner | 1 % |
| b) | Fibreboard | 10 % |
| c) | Keene | 6 % |
| d) | Owens-Corning Fiberglas | 7 % |
| e) | Porter Hayden | 3 % |
| f) | ~~Veteran Pipe Covering~~ | % |
| g) | ~~State Pipe Covering~~ | % |
| h) | ~~Marine Pipe Covering~~ | % |
| i) | American Insulation | 0.5 % |
| j) | Anchor Packing Co. | 2 % |
| k) | Combustion Engineering, Inc. | 0.5 % |
| l) | Consolidated Edison of NY, Inc. | 1 % |
| m) | ~~Crown, Cork & Seal Co., Inc.~~ | % |
| n) | Eagle-Pitcher Indus. Inc. | 5 % |
| o) | Empire-Ace Insulation Mfg. Co. | 3 % |
| p) | GAF Corporation | 5 % |
| q) | General Dynamics Corporation | 2 % |
| r) | Janos Asbestos Insulation Co. | 3.5 % |

| | | |
|---|---|---|
| s) Johns-Manville Corporation | 10 | % |
| t) King Insulation Co. | 1 | % |
| u) New York Protective Co. | 2 | % |
| v) New York Twine | 1 | % |
| ~~w) Nicolet, Inc.~~ | | % |
| x) Owens-Illinois, Inc. | 2 | % |
| y) Phillip Carey, Inc. | 4 | % |
| x) Pittsburgh-Corning Corp. | 3 | % |
| aa) Robert A Keasbey Co. | 0.5 | % |
| bb) Richmond Co. | 5 | % |
| cc) Southern-Asbestos/H.K. Porter | 2 | % |
| dd) S.W. Anderson Inc. | 5 | % |
| ee) Standard Asbestos/Insulation | 3 | % |
| ff) State Insulation Co. | 2 | % |
| gg) U.S. Rubber,aka Uniroyal, Inc. | 5 | % |
| hh) Unarco | 5 | % |

Total 100%

13. Was the conduct of any of the following companies
reckless disregard for the safety of others? Do not consider any
company whose name has been crossed out in accordance with these
instructions.

| | | | |
|---|---|---|---|
| a) | Atlas Turner | Yes ✓ | No |
| b) | Fibreboard | Yes ✓ | No |
| c) | Keene | Yes ✓ | No |
| d) | Owens-Corning Fiberglas | Yes ✓ | No |
| e) | Porter Hayden | Yes ✓ | No |

14. Did any of the following companies act knowingly and in
concert to cause the acts upon which any liability is based? Do
not consider any company whose name has been crossed out in
accordance with these instructions.

| | | | |
|---|---|---|---|
| a) | Atlas Turner | Yes ✓ | No |
| b) | Fibreboard | Yes ✓ | No |
| c) | Keene | Yes ✓ | No |
| d) | Owens-Corning Fiberglas | Yes ✓ | No |

STOP: Sign the form and advise the Marshal that you have
 reached a verdict.

_____
 Foreperson

## APPENDIX C

July 22, 1993 CORRECT VERSION

### SPECIAL VERDICT FORM: LUCHNICK CASE

1. Were the asbestos-containing products manufactured by either of the defendants listed below defective or unsafe?

Fibreboard Corporation Yes ✓ No _____
Keene Corporation Yes ✓ No _____

 Proceed to Question 2.

2. Did either of the defendants listed below fail to use reasonable care in respect of foreseeable use in marketing, perparing, warning or failing to warn about their asbestos-containing products?

Fibreboard Corporation Yes ✓ No _____
Keene Corporation Yes ✓ No _____

 If you answered both Questions 1 and 2 "No" as to both defendants, proceed to the STOP instruction at the end of this form. If you answered both Questions 1 and 2 "No" as to either defendant, go to Questions 3, 4, 12, 13 and 14 and strike that defendant's name from the list at each. If you answered "Yes" in regard to either defendant on either or both Question 1 or Question 2, proceed to Question 3.

3. Was Alfred Luchnick exposed to asbestos-containing products of either of the defendants?

Fibreboard Corporation Yes ___✓___ No _____
Keene Corporation Yes ___✓___ No _____

> If you answered "No" to this Question in regard to both defendants, proceed to the STOP instruction at the end of this form. If you answered "No" to this question in regard to any one defendant, go to Questions 4, 12, 13 and 14 and strike that defendant's name from the list in each. If you answered "Yes" in regard to either defendant, proceed to Question 4.

4. Was the exposure to either of these defendants' asbestos-containing products a proximate cause of Alfred Luchnick's mesothelioma?

Fibreboard Corporation Yes ___✓___ No _____
Keene Corporation Yes ___✓___ No _____

> If you answered "No" to this Question as to both defendants, proceed to the STOP instruction at the end of this form. If you answered "No" to this Question in regard to either defendant, go to Questions 12, 13 and 14 and strike that defendant's name from the list at each. If you answered "Yes" to this Question as to either defendant, proceed to Question 5.

### Damages

5. State the economic damages, if any, to Alfred Luchnick and to his family arising out of his death with respect to the following:

 a) Funeral expenses $ 9,951

 b) Loss of services to Mrs. Luchnick from the time of his death to the present $ 8,000

 c) Loss of services to Mrs. Luchnick in the future (undiscounted) $ 228,000

 How many years? 19

 Proceed to Question 6.

6. State the noneconomic damages, if any, to the Luchnicks arising out of Alfred Luchnick's death with respect to the following:

 d) Alfred Luchnick's pain and suffering $ 3,000,000

 e) Loss of consortium to Joselyn Luchnick during the course of his illness $ 1,400,000

 Proceed to Question 7.

## Non-Party Manufacturers

7. Were the asbestos-containing products manufactured by any of the non-party defendants listed below defective or unsafe?

a. Anchor Packing Yes ✓ No_____
b. Armstrong World Indus, Inc. Yes ✓ No_____
c. Combusion Engineering, Inc. Yes ✓ No_____
d. Eagle-Pitcher Yes ✓ No_____
e. Flexitallic Yes ✓ No_____
f. GAF Corporation Yes ✓ No_____
g. Garlock Yes ✓ No_____
h. Johns-Mansville Yes ✓ No_____
i. Kentile Yes ✓ No_____
j. Keasbey & Madison Yes ✓ No_____
k. Nicolet Yes ✓ No_____
l. Owens-Illinois, Inc. Yes ✓ No_____
m. Phillip Carey Yes ✓ No_____
n. Raybestos Manhatten Yes ✓ No_____
o. Unarco Yes ✓ No_____

Proceed to Question 8.

8. Did any of the non-party defendants listed below fail to use reasonable care in respect of foreseeable use in marketing, preparing, warning or failing to warn about asbestos?

a. Anchor Packing Yes ✓ No_____
b. Armstrong World Indus, Inc. Yes ✓ No_____
c. Combusion Engineering, Inc. Yes ✓ No_____
d. Eagle-Pitcher Yes ✓ No_____
e. Flexitallic Yes ✓ No_____
f. GAF Corporation Yes ✓ No_____
g. Garlock Yes ✓ No_____
h. Johns-Mansville Yes ✓ No_____
i. Kentile Yes ✓ No_____
j. Keasbey & Madison Yes ✓ No_____
k. Nicolet Yes ✓ No_____
l. Owens-Illinois, Inc. Yes ✓ No_____
m. Phillip Carey Yes ✓ No_____
n. Raybestos Manhatten Yes ✓ No_____
o. Unarco Yes ✓ No_____

If you answered both Questions 7 and 8 "No" as to all non-party defendants, proceed to Question 11. If you answered both Questions 7 and 8 "No" as to any non-party

defendant, go to Questions 9, 10, and 12 and strike that defendant's name from the list at each. If you answered "Yes" in regard to any non-party defendant on either or both Question 7 or Question 8, proceed to Question 9.

9. Was Alfred Luchnick exposed to any of these non-party defendants' asbestos-containing products?

| | | Yes | No |
|---|---|---|---|
| a. | Anchor Packing | ✓ | |
| b. | Armstrong World Indus, Inc. | ✓ | |
| c. | Combusion Engineering, Inc. | | ✓ |
| d. | Eagle-Pitcher | ✓ | |
| e. | Flexitallic | ✓ | |
| f. | GAF Corporation | ✓ | |
| g. | Garlock | ✓ | |
| h. | Johns-Mansville | ✓ | |
| i. | Kentile | ✓ | |
| j. | Keasbey & Mattison | ✓ | |
| k. | Nicolet | | ✓ |
| l. | Owens-Illinois, Inc. | ✓ | |
| m. | Phillip Carey | ✓ | |
| n. | Raybestos Manhatten | ✓ | |
| o. | Unarco | ✓ | |

If you answered "No" to this Question in regard to all non-party defendants, proceed to Question 11. If you answered "No" to this Question in regard to any non-party defendant, go to Questions 10 and 12 and strike that defendant's name from the list at each. If you answered "Yes" in regard to any defendant, proceed to Question 10.

10. Did the exposure to any of the asbestos-containing products of the non-party defendants cause Alfred Luchnick's mesothelioma?

| | | Yes | No |
|---|---|---|---|
| a. | Anchor Packing | ✓ | |
| b. | Armstrong World Indus, Inc. | ✓ | |
| ~~c.~~ | ~~Combusion Engineering, Inc.~~ | ~~Yes~~ | ~~No~~ |
| d. | Eagle-Pitcher | ✓ | |
| e. | Flexitallic | ✓ | |
| f. | GAF Corporation | ✓ | |
| g. | Garlock | ✓ | |
| h. | Johns-Mansville | ✓ | |
| i. | Kentile | ✓ | |
| j. | Keasbey & Madison | ✓ | |
| ~~k.~~ | ~~Nicolet~~ | ~~Yes~~ | ~~No~~ |
| l. | Owens-Illinois, Inc. | ✓ | |
| m. | Phillip Carey | ✓ | |
| n. | Raybestos Manhatten | ✓ | |
| o. | Unarco | ✓ | |

If you answered "No" to this Question as to all non-party
defendants, just proceed to Question 11. If you answered
"No" to this Question in regard to any non-party
defendant, go to Questions 12 and strike that defendant's
name from the list. Proceed to Question 11.

11. Did the negligence of the United States Navy (Brooklyn navy
Yard) proximately cause his mesothelioma?

Yes_____✓_____ No_____

12. Determine the percentage which represents the relative share
of the responsibility of each direct defendant and non-party
defendant arising out of Alfred Luchnick's mesothelioma. The
total must be 100%. Do not assign a percentage to any company
whose name has been crossed out in accordance with these
instructions.

| | | |
|---|---|---|
| a. | Fibreboard Corporation | 7.5 % |
| b. | Keene Corporation | 7.5 % |
| c. | Anchor Packing | 3 % |
| d. | Armstrong World Indus, Inc. | 2 % |
| e. | ~~Combustion Engineering, Inc.~~ | % |
| f. | Eagle-Pitcher | 10 % |
| g. | Flexitallic | 1 % |
| h. | GAF Corporation | 4 % |
| i. | Garlock | 2 % |
| j. | Johns-Mansville | 15 % |
| k. | Kentile | 1 % |
| l. | Keasbey & Madison | 5 % |
| m. | ~~Nicolet~~ | % |
| n. | Owens-Illinois, Inc. | 10 % |
| o. | Phillip Carey | 10 % |
| p. | Raybestos Manhatten | 6 % |
| q. | Unarco | 6 % |
| r. | United States (Brooklyn Navy Yard) | 10 % |

Total 100%

13. Was the conduct of any of the following defendants in reckless disregard for the safety of others? Do not consider a company whose name has been crossed out in accordance with these instructions.

 a) Fibreboard Yes __√__ No _____

 b) Keene Corporation Yes __√__ No _____

14. Did any of the following defendants act knowingly and in concert to cause the acts upon which liability is based? Do not consider a company whose name has been crossed out in accordance with these instructions.

 a) Fibreboard Yes __√__ No _____

 b) Keene Corporation Yes __√__ No _____

**STOP:** Sign the form and advise the Marshal that you have reached a verdict.

_Jeffery Myles_
 Foreperson

## APPENDIX D

**SPECIAL VERDICT FORM: PULIZZI CASE**

1. Were the asbestos-containing products manufactured by either of the defendants listed below defective or unsafe?

Fibreboard Corporation Yes _√_ No _____
Keene Corporation Yes _√_ No _____

 Proceed to Question 2.

2. Did either of the defendants listed below fail to use reasonable care in respect of foreseeable use in marketing, perparing, warning or failing to warn about their asbestos-containing products?

Fibreboard Corporation Yes _√_ No _____
Keene Corporation Yes _√_ No _____

 If you answered both Questions 1 and 2 "No" as to both defendants, proceed to the STOP instruction at the end of this form. If you answered both Questions 1 and 2 "No" as to either defendant, go to Questions 3, 4, 12, 13 and 14 and strike that defendant's name from the list at each. If you answered "Yes" in regard to either defendant on either or both Question 1 or Question 2, proceed to Question 3.

3. Was Peter Pulizzi exposed to asbestos-containing products of either of the defendants?

Fibreboard Corporation Yes _√_ No _____
Keene Corporation Yes _√_ No _____

 If you answered "No" to this Question in regard to both defendants, proceed to the STOP instruction at the end of this form. If you answered "No" to this question in regard to any one defendant, go to Questions 4, 12, 13 and 14 and strike that defendant's name from the list at each. If you answered "Yes" in regard to either defendant, proceed to Question 4.

4. Was the exposure to either of these defendants' asbestos-containing products a proximate cause of Peter Pulizzi's mesothelioma?

Fibreboard Corporation Yes ✓ No _____
Keene Corporation Yes ✓ No _____

 If you answered "No" to this Question as to both defendants, proceed to the STOP instruction at the end of this form. If you answered "No" to this Question in regard to either defendant, go to Questions 12, 13 and 14 and strike that defendant's name from the list at each. If you answered "Yes" to this Question as to either defendant, proceed to Question 5.

### Damages

5. State the economic damages, if any, to Peter Pulizzi and to his family arising out of his death with respect to the following:

 a) Funeral expenses $ 10,000

 b) Loss of services to Mrs. Pulizzi from the time of his death to the present $ 12,000

 c) Loss of services to Mrs. Pulizzi in the future (undiscounted) $ 2,00,000

 How many years 11

 Proceed to Question 6.

6. State the noneconomic damages, if any, to the Pulizzis arising out of Peter Pulizzi's death with respect to the following:

 d) Peter Pulizzi's pain and suffering $ 5,500,000

 e) Loss of consortium to Anne Pulizzi during the course of his illness $ 2,700,000

 Proceed to Question 7

## Non-Party Manufacturers

7. Were the asbestos-containing products manufactured by any of the non-party defendants listed below defective or unsafe?

| | | | |
|---|---|---|---|
| a. | Anchor Packing | Yes ✓ | No |
| b. | Armstrong World Indus. Inc. | Yes ✓ | No |
| c. | Combusion Engineering, Inc. | Yes | No ✓ |
| d. | Eagle-Pitcher | Yes ✓ | No |
| e. | Flexitallic | Yes ✓ | No |
| f. | GAF Corporation | Yes ✓ | No |
| g. | Garlock | Yes ✓ | No |
| h. | Johns-Mansville | Yes ✓ | No |
| i. | Kentile | Yes ✓ | No |
| j. | Keasbey & Madison. | Yes ✓ | No |
| K. | Lorillard Corporation | Yes | No ✓ |
| l. | Nicolet | Yes | No ✓ |
| m. | Owens-Illinois, Inc. | Yes ✓ | No |
| n. | Phillip Carey, | Yes ✓ | No |
| o. | Raybestos Manhatten, | Yes ✓ | No |
| p. | Unarco | Yes ✓ | No |

Proceed to Question 8.

8. Did any of the non-party defendants listed below fail to use reasonable care in respect of foreseeable use in marketing, preparing, warning or failing to warn about asbestos?

| | | | |
|---|---|---|---|
| a. | Anchor Packing | Yes ✓ | No |
| b. | Armstrong World Indus, Inc. | Yes ✓ | No |
| c. | Combusion Engineering, Inc. | Yes | No ✓ |
| d. | Eagle-Pitcher | Yes ✓ | No |
| e. | Flexitallic | Yes ✓ | No |
| f. | GAF Corporation | Yes ✓ | No |
| g. | Garlock | Yes ✓ | No |
| h. | Johns-Mansville | Yes ✓ | No |
| i. | Kentile | Yes ✓ | No |
| j. | Keasbey & Madison | Yes ✓ | No |
| k. | Lorillard Corp. | Yes | No ✓ |
| l. | Nicolet | Yes | No ✓ |
| m. | Owens-Illinois, Inc. | Yes ✓ | No |
| n. | Phillip Carey --- | Yes ✓ | No |
| o. | Raybestos Manhatten, | Yes ✓ | No |
| p. | Unarco | Yes ✓ | No |

If you answered both Questions 7 and 8 "No" as to all non-party defendants, proceed to Question 11. If you answered both Questions 7 and 8 "No" as to any non-party defendant, go to Questions 9, 10 and 12 and strike that defendant's name from the list at each. If you answered "Yes" in regard to any non-party defendant on either or both Question 7 or Question 8, proceed to Question 9.

9. Was Peter Pulizzi exposed to any of these non-party defendants' asbestos-containing products?

| | | Yes | No |
|---|---|---|---|
| a. | Anchor Packing | ✓ | |
| b. | Armstrong World Indus, Inc. | ✓ | |
| c. | Combusion Engineering, Inc. | | |
| d. | Eagle-Pitcher | ✓ | |
| e. | Flexitallic | ✓ | |
| f. | GAF Corporation | ✓ | |
| g. | Garlock | ✓ | |
| h. | Johns-Mansville | ✓ | |
| i. | Kentile | ✓ | |
| j. | Keasbey & Madison | ✓ | |
| k. | Lorillard | | |
| l. | Nicolet | | |
| m. | Owens-Illinois, Inc. | ✓ | |
| n | Phillip Carey | ✓ | |
| o. | Raybestos Manhatten | ✓ | |
| p. | Unarco | ✓ | |

If you answered "No" to this Question in regard to all non-party defendants, proceed to Question 11. If you answered "No" to this Question in regard to any non-party defendant, go to Questions 10 and 12 and strike that defendant's name from the list at each. If you answered "Yes" in regard to any defendant, proceed to Question 10.

10. Did the exposure to any of the asbestos-containing products of the non-party defendants cause Peter Pulizzi's mesothelioma?

| | | Yes | No |
|---|---|---|---|
| a. | Anchor Packing | ✓ | |
| b. | Armstrong World Indus, Inc. | ✓ | |
| c. | Combusion Engineering, Inc. | | |
| d. | Eagle-Pitcher | ✓ | |
| e. | Flexitallic | ✓ | |
| f. | GAF Corporation | ✓ | |
| g. | Garlock | ✓ | |
| h. | Johns-Mansville | ✓ | |
| i. | Kentile | ✓ | |
| j. | Keasbey & Madison | ✓ | |
| k. | Lorillard Corp. | | |

| | | Yes | No |
|---|---|---|---|
| ~~l.~~ | ~~Nicolet~~ | ~~Yes~~ | ~~No~~ |
| m. | Owens-Illinois, Inc. | Yes ✓ | No |
| n. | Phillip Carey | Yes ✓ | No |
| o. | Raybestos Manhatten, | Yes ✓ | No |
| p. | Unarco | Yes ✓ | No |

If you answered "No" to this Question as to all non-party defendants, proceed to Question 11. If you answered "No" to this Question in regard to any non-party defendant, go to Question 12 and strike that defendant's name from the list. Proceed to Question 11.

11. Did any negligence of the United States Navy (Brooklyn Navy Yard) proximately cause his mesothelioma?

Yes ✓ No

If you answered "No" to this Question strike the name of this nonparty defendant from the list at Question 12. Proceed to Question 12.

12. Determine the percentage which represents the relative share of the responsibility of each direct defendant and non-party defendant arising out of Peter Pulizzi's mesothelioma. The total must be 100%. Do not assign a percentage to any company whose name has been crossed out in accordance with these instructions.

| | | |
|---|---|---|
| a. | Fibreboard Corporation | 7.5 % |
| b. | Keene Corporation | 7.5 % |
| c. | Anchor Packing | 3 % |
| d. | Armstrong World Indus, Inc. | 2. % |
| e. | Combusion Engineering, Inc. | 0 % |
| f. | Eagle-Pitcher | 10 % |
| g. | Flexitallic | 1 % |
| h. | GAF Corporation | 4 % |
| i. | Garlock | 2 % |
| j. | Johns-Mansville | 15 % |
| k. | Kentile | 1 % |
| l. | Keasbey & Madison | 5 % |
| m. | Lorillard | 0 % |
| n. | Nicolet | 0 % |
| o. | Owens-Illinois, Inc. | 10 % |
| p. | Phillip Carey | 10 % |
| q. | Raybestos Manhatten | 6 % |
| r. | Unarco | 6 % |
| s. | United States (Brooklyn Navy Yard) | 10 % |

Total 100%

13. Was the conduct of any of the following defendants in reckless disregard for the safety of others? Do not consider a company whose name has been crossed out in accordance with these instructions.

a) Fibreboard Yes __✓__ No _____

b) Keene Corporation Yes __✓__ No _____

14. Did any of the following defendants act knowingly and in concert to cause the acts upon which liability is based? Do not consider a company whose name has been crossed out in accordance with these instructions.

a) Fibreboard Yes __✓__ No _____

b) Keene Corporation Yes __✓__ No _____

STOP: Sign the form and advise the Marshal that you have reached a verdict.

_Jeffrey Myles_
Foreperson

APPENDIX E

Carl D'Andrilli
1375 Merry Ave.
Bronx, N.Y. 10461
1-(718)82387

Honorable Robert W. Sweet
U.S. Court House
Foley Square, room 2202
New York, N.Y. 10007.

RECEIVED
JUL 0 1993
JUDGE SWEET CHAMBERS

Dear Judge Sweet,

 I was a juror on the asbestos death and injury case involving Talbot, Consorti, Luchnick and Pulizzi versus various defendants and many non-party defendants. The case ended July 24, 1993.

 I'm writing to inform you that on Friday, July 23rd and Saturday July 24th, Mrs Georgia Arnold, another juror, stated that John's-Manville, a non-party defendant possesses a one billion dollar fund to pay lawyer's fees to fight asbestos litigation cases. She made these remarks to the jury while we were deliberating monetary awards in the Consorti and Pulizzi cases. She also mentioned this "fund" one other time, a few days before deliberations began.

 I didn't know if this was general "knowledge" that a well-informed person could possess while serving as a juror dealing with well-publicized matters; or if it was improper. Although, I was somewhat troubled, I decided, perhaps wrongly, not to immediately inform you.

 After the completion of the case on Saturday, jurors and lawyers were engaged in conversation outside the courtroom and later in front of the building. A lawyer commented to me that Mrs. Arnold had remarked that

she was disappointed that the award wasn't larger. He asked me how much higher she desired to go. I answered probably much higher since she believed John's Manville was spending one billion to fight cases. The lawyers told me they considered this an important piece of information.

On Tuesday July 27 and Wednesday July 28, Mr Silbert called me in an attempt to persuade me to sign a statement regarding the John's Manville one billion "lawyer fund" remark. I declined to do so.

However, the lawyers reaction combined with my earlier discomfort over this remark, convinced me that I should inform you of this situation.

I called your chambers in hopes of making an appointment to personally inform you. I was told on Wed. July 27 that you were on vacation. I then decided on this letter.

In closing, I would like to apologize for any difficulty that any poor judgment on my part may have caused or will cause the court, jurors, parties.

Sincerely,
Carl D'Andrilli

SWEET, District Judge.

The defendants Fibreboard Corporation, Owens–Corning Fiberglas Corporation, Atlas Turner, Inc., Porter Hayden Company, and the Flintkote Company (collectively, the "Defendants"), have moved by order to show cause pursuant to Rule 3(j) of the Civil Rules of the Southern District of New York ("Rule 3(j)") seeking leave to reargue certain issues addressed in this Court's opinion in this matter filed on January 21, 1994, and reported at 847 F.Supp. 1086 (S.D.N.Y.1994) (the "January 21 Opinion"). For the following reasons, this motion is granted in part and denied in part.

## Facts, Parties, and Prior Proceedings

The facts, parties, and prior proceedings in these cases have been fully recounted in prior opinions of this Court, familiarity with which is assumed. *See, e.g., In re New York Asbestos Litigation,* 847 F.Supp. 1086 (S.D.N.Y.1994); *In re New York Asbestos Litig.,* 149 F.R.D. 490 (S.D.N.Y.1993); *In re New York Asbestos Litig.,* 145 F.R.D. 644 (S.D.N.Y.1993).

After 25 days of trial, Special Verdicts were rendered in this case seriatim on July 22, 23, and 24, 1993, and on August 19, 1993, certain motions were filed seeking discovery with respect to judgment molding. Post trial motions pursuant to Rule 50(b) of the Federal Rules of Civil Procedure were made September 14. These motions and issues related to judgment molding were addressed in the January 21 Opinion. This motion was considered fully submitted as of February 9, 1994.

## Standard for Motion to Reargue Under Rule 3(j)

Rule 3(j) provides in pertinent part: "[t]here shall be served with [a] notice of motion [for reargument] a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." The standards controlling a motion for reargument pursuant to Rule 3(j) and a motion to amend the judgment pursuant to Rule 59(e), Fed.R.Civ.P., are the same. *See Morser v. AT & T Info. Sys.,* 715 F.Supp. 516, 517 (S.D.N.Y.1989); *Lotze v. Hoke,* 654 F.Supp. 605, 607 (E.D.N.Y.1987).

Thus, to be entitled to reargument under Rule 3(j), the Defendants must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the it on the underlying motion. *See Violette v. Armonk Assocs. L.P.,* 823 F.Supp. 224, 226 (S.D.N.Y.1993); *Morin v. Trupin,* 823 F.Supp. 201, 205 (S.D.N.Y.1993); *East Coast Novelty Co. v. City of New York,* 141 F.R.D. 245, 245 (S.D.N.Y.1992).

Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. *See Caleb & Co. v. E.I. Du Pont De Nemours & Co.,* 624 F.Supp. 747, 748 (S.D.N.Y.1985). In deciding a Rule 3(j) motion, the court must not allow a party to use the motion to reargue as a substitute for appeal. *See Morser,* 715 F.Supp. at 517.

When the requisites of a Rule 3(j) motion—overlooked facts or caselaw—have not been met, a court may address the substance of the arguments raised in a Rule 3(j) motion to provide additional clarification of the issues sought to be reargued. This clarification serves to apprise the parties that, even if reargument were granted, it would be unavailing. *CMNY Capital, L.P. v. Deloitte & Touche,* 821 F.Supp. 152, 162 (S.D.N.Y. 1993); *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988).

## Discussion

### Pain and Suffering

The first issue raised by the Defendants relates to the denial of their motion to remit the awards for pain and suffering. The Second Circuit has stated that a court should remit a verdict only if it is so excessive as to shock the judicial conscience. *Petramale v. Local No. 17 of Laborers' Int'l Union,* 847 F.2d 1009, 1012 (2d Cir.1988). In deciding whether to remit the awards for pain and suffering in this case, the January 21 Opinion noted that, if remittitur were to be contemplated at all, reduction of the verdict could be permitted only so far as the "maximum amount that would be upheld ... as not excessive" and not a penny less. The Court further noted that, in determining whether

an award "shocked" the judicial conscience, it was appropriate to refer to awards in other actions of a similar character. January 21 Opinion at *14.[1]

In determining whether the awards in the present case "shocked" the judicial conscience, the Court considered a number of factors, among them the opinion of Judge Sifton *In re Joint E. & S. Dists. Asbestos Litig.*, 798 F.Supp. 925, 938 (E.D.N.Y.1992) ("McPadden"), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.), *and rev'd on other grounds*, 995 F.2d 346 (2d Cir.1993). Martin McPadden, the plaintiff in that case, died of mesothelioma, the disease afflicting the plaintiffs in the present cases. Judge Sifton has had extensive experience trying asbestos-related cases, and reference to his conclusions on remittitur in *McPadden* was appropriate.

The January 21 Opinion noted that, in *McPadden*, Judge Sifton found that no remittitur was required for an award of $4,500,-000 for pain and suffering caused by mesothelioma of 11 month's duration, which meant that McPadden was awarded $409,090.91 per month of pain and suffering. After reviewing the extensive pain and suffering experienced by the Plaintiffs in the present actions, the January 21 Opinion concluded that the amounts awarded to these plaintiffs for pain and suffering were not so disparate from that accepted by Judge Sifton in *McPadden* as to shock the judicial conscience. Remittitur was, therefore, denied. January 21 Opinion at *14–17.

The January 21 Opinion noted that, in reaching his conclusions in *McPadden*, Judge Sifton referred to the fact that Justice Freedman of the New York Supreme Court, who also has extensive experience trying asbestos-related cases, had "allowed several multimillion dollar awards for pain and suffering in the state court's Brooklyn Navy Yard consolidation." January 21 Opinion at *6 (citing *McPadden*, 798 F.Supp. at 938).

The January 21 Opinion concluded that Justice Freedman no longer felt constrained by the factors which she found applicable to the remittitur of pain and suffering awards in *Didner v. Keene Corp.*, Index No. 27373/89, N.Y.Sup.Ct. (Dec. 17, 1990), *reported in* N.Y.L.J., January 4, 1991, at 22 col. 2. *See* January 21 Opinion at *14.

The Defendants claim on the present motion that, in the Brooklyn Navy Yard cases, Justice Freedman did apply the standards enunciated in *Didner*, and that therefore the January 21 Opinion's conclusions regarding remittitur were in error.

Initially, the Court did not "overlook" the Brooklyn Navy Yard consolidation cases, nor is a decision of the New York Supreme Court "controlling" on this Court within the terms of Rule 3(j). The Defendants have not, therefore, met the standard for reargument under the Rule.

Even if reargument were granted on this issue, it would be unavailing. In *Didner*, Justice Freedman considered a number of factors, including awards in other cases, the severity of suffering, and the length of time that the plaintiff suffered, to reduce an award for mesothelioma of twenty-seven months' duration from $3,250,000 to $2,300,-000. Converting this to a monthly rate for purposes of comparison, Justice Freedman approved an award of $85,185.19 per month for the mesothelioma-related pain and suffering in *Didner*.

The January 21 Opinion concluded that Justice Freedman did not feel constrained by the amounts determined in *Didner*, and in the state Brooklyn Navy Yard consolidation, she approved several awards for mesothelioma-related pain and suffering at a higher monthly rate than that which she approved in *Didner*.[2] Justice Freedman does not, therefore, regard the amount awarded in

---

1. In this opinion, all citations to specific pages of the January 21 Opinion will refer to the pagination as available in the following manner: "January 21 Opinion at ——."

2. *See In re New York City Asbestos Litigation*, Index No. 40.000/88 (May 31, 1991) (award for Emanuel Cohen: $88,235.29 per month; award

for Harry Greenberg: $200,000 per month; award for Lawrence Gold: $111,111.11 per month; award for Eugene Kuliberda: $142,-857.14 per month; award for John Lipari: $150,000 per month; award for Luciano Lopez: $85,714.29 per month; award for Biagio Russo: $125,000.00 per month).

*Didner* as a permanent ceiling on such awards.

The decision whether to remit an award for pain and suffering can never be reduced to the application of a predetermined monthly rate. As was stated in the January 21 Opinion, "[t]he conscience of the courts must not remain fixed in time but must rather retain the capacity for change based on the experience of others and the determinations made in particular cases." January 21 Opinion at *16. Judge Sifton, after a careful consideration of McPadden's circumstances, and with reference to Justice Freedman's awards in the Brooklyn Navy Yard consolidation, concluded that an award of $409,090.91 per month for mesothelioma-related pain and suffering did not shock the judicial conscience. The January 21 Opinion, after consideration of the circumstances of the plaintiffs before the Court and with reference to Judge Sifton's conclusions in *McPadden*, concluded that the awards for pain and suffering in the present cases likewise do not shock this judicial conscience.

While Justice Freedman continues to apply the reasoning that she applied in *Didner*, the amounts awarded in *Didner* do not represent a fixed ceiling for pain and suffering awards in mesothelioma cases. If the January 21 Opinion was ambiguous in that regard, it has now been clarified, thus obviating reargument of the January 21 Opinion.

Further, in considering the question of remittitur in the *Consorti* case, the January 21 Opinion states that:

> The standards discussed above, when applied to the awards made by the jury for pain and suffering, indicate the jury's finding was consistent with those considered by Judge Sifton and the conclusions here previously reached, as is the award for the loss of past consortium.

January 21 Opinion at *42.

The Defendants point out that the January 21 Opinion applied the remittitur standards considered by Judge Sifton in *McPadden* to the awards of pain and suffering, and the remittitur standards enunciated by Justice Freedman in *Didner* to the awards for loss of consortium in *Tabolt* and in *Luchnick*.

As an initial matter, the Defendants, by referring to the explicit discussion of Mrs. Consorti's award for past consortium, have not referred to any facts or case law overlooked by the Court in the January 21 Opinion, and therefore fail to meet the Rule 3(j) standard, although clarification may be in order.

The January 21 Opinion stated that the pain and suffering awards in *Consorti* were consistent with those considered by Judge Sifton and the conclusions previously reached. The Opinion stated that the award for the loss of past consortium was also consistent with the conclusions previously reached. The Opinion could be said to be ambiguous in that the sentence quoted above could appear to indicate that the Court had found Mrs. Consorti's loss of consortium award to be consistent with *McPadden* rather than *Didner*, but that was not the Court's intent. This exercise to abbreviate an opinion which turned out to be one hundred pages in length may seem to be ambiguous, but does not result in a ground for reargument.

Similarly, the Defendants seek to reargue the issue of remittitur of the award for loss of consortium to Mrs. Pulizzi. The January 21 Opinion addressed the issues specific to each plaintiff in the order that the verdicts were rendered. The *Pulizzi* case was, therefore, addressed last. The extensive discussions of the issues with respect to the first three verdicts had addressed most of the issues raised by the defendants in *Pulizzi*, and therefore the January 21 Opinion stated that "[t]he determinations set forth above dispose of the issues raised with respect to Pulizzi, whose case was comparable to Luchnick's except for the cigarette defense and an excessive loss of consortium award." January 21 Opinion at *49.

By this, the Court attempted to convey concisely that the conclusions reached with regard to *Luchnick* should control with regard to *Pulizzi*, save for the two exceptions noted. In *Luchnick*, the Court found that the damages for loss of consortium awarded to Mrs. Luchnick were excessive, and remitted them according to the considerations espoused by Justice Freedman in *Didner*. By

stating that *Pulizzi* should be considered similar to *Luchnick* "except for the . . . excessive loss of consortium award," the January 21 Opinion indicated that the Court found no excessive loss of consortium award in *Pulizzi*. While this appeared clear to the writer of the Opinion at the time, it has evidently caused some confusion on the part of the *Pulizzi* defendants, which has now been rectified.

In addition to the syntax-based claims, the Defendants raise the substantive concern that, in failing to remit Mrs. Consorti's and Mrs. Pulizzi's damages for past loss of consortium, the January 21 Opinion was inconsistent both internally, and with the *Didner* standards that it purported to apply.

Mrs. Pulizzi's loss of consortium lasted 34 months, for which the jury awarded her $2,700,000. Mrs. Consorti's past loss of consortium lasted for 23 months, for which she was awarded $2,000,000. Mrs. Tabolt's past loss of consortium lasted for 18 months, for which the jury awarded her $3,750,000. In other words, the jury awarded Mrs. Tabolt $1,050,000 more than they awarded Mrs. Pulizzi for loss of consortium of 16 months shorter duration. In addition, the jury awarded Mrs. Tabolt $1,750,000 more than they awarded Mrs. Consorti for loss of consortium of five months' shorter duration. Mrs. Luchnick's past loss of consortium lasted for less than 11 months, for which the jury awarded her $1,400,000.

In order to achieve internal consistency, taking into consideration the duration of these damages as well as other characteristics specific to each plaintiff, Mrs. Tabolt's past loss of consortium award was remitted to $1,500,000 and Mrs. Luchnick's award for past loss of consortium was remitted to $500,000.

The awards in this case are also not in conflict with *Didner*. As noted in the January 21 Opinion, Judge Sifton did not refer to Justice Freedman's Brooklyn Navy Yard cases in reaching his conclusions with regard to remittitur of the loss of consortium awards in *McPadden*. The Court therefore applied the reasoning espoused by Justice Freedman directly in the present cases, rather than applying that reasoning as interpreted by

Judge Sifton, as was done with regard to the awards for pain and suffering. January 21 Opinion at *7.

In *Didner,* Justice Freedman remitted an award for loss of consortium based on a consideration of intangible components of the "real injury done to the marital relationship." Utilizing the reasoning applied in *Didner* does necessarily result in an exact congruence between the awards in that case and those allowed in the present case. Considering the intangible elements discussed by Justice Freedman, the awards for past loss of consortium in *Consorti* and *Pulizzi* do not shock the judicial conscience, and are internally consistent with the awards in *Luchnick* and *Tabolt*.

The next ground for reargument raised by the Defendants relates to the fact that the Court set aside the jury's response to question 5(h) of the Special Verdict Form ("Question 5(h)") used in the trial of the *Consorti* case pursuant to Fed.R.Civ.P. 59, as being so strongly against the weight of the evidence as to constitute a seriously erroneous result. In answering Question 5(h), the jury had implicitly found that Consorti's life expectancy with mesothelioma was 26.2 years. The jury had heard testimony during the trial that Consorti's life expectancy without mesothelioma was 26.2 years, and there was no evidence upon which the jury could have found that his life expectancy was unchanged with mesothelioma. *See* January 21 Opinion *42.

The Defendants assert that the answer to Question 5(h) was irreconcilable with the answer to question 5(a) on the same form relating to Mr. Consorti's damages for pain and suffering, a fact which was discussed at length in the January 21 Opinion at *37–42. They claim that this fact requires a retrial of both the issue of Mrs. Consorti's damages for future loss of consortium and of the issue of Mr. Consorti's pain and suffering.

The Defendants point to no facts overlooked in the January 21 Opinion. Far from referring to any controlling opinions the Court may have overlooked, they direct the Court to the Opinions cited in the January 21

Opinion with regard to an inconsistency in the answers on the Special Verdict Form used in the *Tabolt* trial. The Defendants have, therefore, clearly failed to meet the standard for reargument under Rule 3(j).

The cases referred to by the Defendants, which are discussed at length in the January 21 Opinion, stand for the proposition that, when a jury's inconsistent answers on a special verdict form cannot be harmonized, a court may not simply disregard one answer in order to eliminate the inconsistency. *See, e.g., Brooks v. Brattleboro Mem. Hosp.*, 958 F.2d 525, 529 (2d Cir.1992); *Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir.1990); *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir.1988); *Schaafsma v. Morin Vermont Corp.*, 802 F.2d 629, 645 (2d Cir.1986); *Bernardini v. Rederi A/B Saturnus*, 512 F.2d 660, 662 (2d Cir.1975).

The January 21 Opinion was cognizant of this legal proposition and, in fact, applied it in the *Tabolt* case. *See* January 21 Opinion at *10. In the *Consorti* case, however, the Court did not disregard an answer in order to eliminate the inconsistency on the Special Verdict Form. Under Fed.R.Civ.P. 59, a new trial may be granted on all or part of the issues if the verdict of the jury is so strongly against the weight of the evidence that it may be characterized as a "seriously erroneous result." *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir.1992); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir.1988); *Flynn v. Goldman, Sachs & Co.*, 836 F.Supp. 152 (S.D.N.Y. Nov. 8, 1993). The jury's answer to Question 5(h) was set aside on the basis of this Rule. After setting aside this finding, there was no remaining inconsistency, and no reason to disturb the jury's findings further.

In *Gallick v. Baltimore & O.R.R. Co.*, 372 U.S. 108, 119–20, 83 S.Ct. 659, 665–66, 9 L.Ed.2d 618 (1963), the Supreme Court held that, when confronted with seemingly inconsistent answers on a special verdict form, a court is obligated to try to reconcile the jury's findings and should require a new trial only in the case of a fatal inconsistency.

This holding was interpreted in *Floyd v. Laws*, 929 F.2d 1390 (9th Cir.1991). In *Floyd*, the court used a special verdict form in a case brought under 42 U.S.C. § 1983 and state tort law causes of action. Question 13 of the Special Verdict Form ("Question 13") asked whether the plaintiffs had been damaged as a result of the defendants actions, to which the jury responded "No." After question 13 appeared the following instruction: "If your answer to question 13 is 'No,' do not answer any further questions." The jury disregarded this instruction and went on to answer question 14 on the special verdict form ("Question 14").

Question 14 asked what amount of money would compensate the plaintiff for the defendants actions, to which the jury responded $7,500 dollars. This answer appeared inconsistent with the answer to Question 13.

The Ninth Circuit held that, although a judge faced with seemingly inconsistent answers could not simply disregard one answer, the judge could disregard an answer that was given in contravention of the instructions on the special verdict form and was, therefore, mere surplusage. A trial court should defer only to legitimate or viable findings of fact. Since the answer to Question 14 was not a legitimate or viable finding of fact, it was proper for the trial judge to disregard it. Disregarding this answer eliminated its inconsistency with the answer to Question 13, and the court held that it was therefore proper to enter judgment on the basis of the answer to Question 13. *Floyd*, 929 F.2d at 1396–1400.

The answer to Question 5(h) on the *Consorti* special verdict form is similar to the answer to Question 14 in *Floyd*. Since the answer to Question 5(h) was so strongly against the weight of the evidence as to be characterized as a seriously erroneous result, it was not a legitimate or viable finding of fact, and was properly disregarded. Since disregarding the answer to Question 5(h) eliminated any inconsistency with the answer to Question 5(a), it was proper not to disturb the jury's answer to Question 5(a).

The Defendants next object to the fact that certain grounds for reducing the damages awarded in the present cases were not specifically addressed in the January 21 Opinion.

In addition, they object that certain grounds for a new trial in *Tabolt*, which were briefed in their motions for a new trial, were not discussed in the January 21 Opinion.

"In a complex case with voluminous submissions, the Court cannot be expected to mention each and every argument and submission, however important one of the parties believes an item to be." *Market St. Ltd. Partners v. Englander Capital Corp.*, 1993 WL 276062, at *1, 1993 U.S. Dist. LEXIS 10002, at *3 (S.D.N.Y. July 21, 1993) (denying Rule 3(j) motion to reargue); *accord Woodward & Dickerson v. Kahn*, 1992 WL 349681, at *2–3, 1992 U.S. Dist. LEXIS 17032, at *6 (S.D.N.Y. Nov. 5, 1992) (same).

With regard to the grounds for reducing the damages awarded in these cases, the Defendants point to the fact that in his closing argument, Consorti's counsel asked the jury to award $36,000 for certain medical expenses. (Tr. at 4415.) The jury awarded $100,000 in past medical expenses.

The $36,000 referred to by the Defendants did not represent all of the medical bills that the Consortis had paid. The jury heard evidence that Mr. and Mrs. Consorti tried a series of experimental medical treatments for which they paid "30–something thousand." (Tr. at 1498.) In addition, the jury heard testimony that Consorti had gone to a clinic in Toronto, Canada for treatments that cost another $6,293.12, which was paid out of their own savings. (Tr. at 1506, Pl.'s Ex. 3.) The jury also heard testimony that the Consortis purchased a variety of items to attempt to improve Consorti's health or increase his comfort, such as vitamins and canes. (Tr. 1504–06.) The award of $100,000 for Consorti's past medical bills was not without basis in the record.

The Defendants also object to the jury's award of $47,500 to Mrs. Consorti for future medical and funeral expenses, claiming that there was no evidence to support this award on the record.

The Court charged the jury in this matter that they could "award a sum of money for any reasonable medical expenses which ... will be incurred in the future in treating Consorti, as well as the cost of funeral or burial if you conclude that he will die of mesothelioma." (Tr. at 4497.) There was no question that Consorti's mesothelioma would prove fatal, and that therefore funeral expenses were appropriate.

The jury heard substantial testimony regarding Consorti's past medical expenses, and found that his life expectancy with mesothelioma was nine months. The jury heard testimony that Mrs. Consorti had been administering an experimental treatment, "714 X serum," to her husband at night. This treatment cost $150 dollars per vial. (Tr. at 1497.) If Mrs. Consorti continued this treatment until Mr. Consorti's anticipated death, this cost alone would account for a significant portion of the $47,500 challenged by the Defendants. In addition, the Consortis were supplied with the implements necessary to continue the treatment that Mr. Consorti received at a clinic in Toronto at home. (Tr. at 1505.) As discussed above, the past costs for this treatment amounted to over $6,000 dollars. It was reasonable for the jury to infer that, if this treatment was continued, the Consortis would incur additional costs. The testimony on past medical expenses, plus the knowledge that Consorti would not improve and would soon require burial, provided a basis from which they could infer Consorti's future medical and funeral expenses.

The Defendants also contend that the jury's awards for loss of services, both past and future, to Mrs. Luchnick and Mrs. Pulizzi were higher than the amounts requested by plaintiffs' counsel. They also object to the fact that, although the plaintiffs' counsel requested damages for Mrs. Luchnick for a period of 9.9 years into the future, the jury awarded damages for 19 years into the future.

The jury was instructed that, in determining damages for loss of services, they should "appraise in an impartial manner to the best of [their] ability, a pecuniary or money value of each decedent's services to his widow on the day he died," (Tr. at 4491), taking into consideration such things as the decedent's character, habits and ability; the circumstances and condition of his wife; and the services he would have performed for his wife.

The jury was also instructed that Mrs. Luchnick was 64 and Mr. Luchnick was 73 at the time of his death, and, according to the mortality tables, Mr. Luchnick had a life expectancy of 83 years. With regard to the mortality tables, the jury was instructed that they are "nothing but statistical averages. They ... are not binding upon you, but they can be considered, together with your own experience and with the evidence which you've have heard about each one of the decedents' health, and habits and employment and activities." (Tr. at 4493.)

The jury heard extensive testimony regarding the nature of the plaintiffs and their relationships with their spouses. The amount of damages found by a jury is not limited to the relief requested by the plaintiff. *Roorda v. American Oil Co.*, 446 F.Supp. 939, 948 (W.D.N.Y.1978) (allowing amendment of pleading to increase alleged damages since this would not have limited jury in any case). The amount awarded to Mrs. Luchnick and Mrs. Pulizzi for lost services are within the bounds of the province of the jury.

Each of the grounds for a new trial in *Tabolt* was considered and rejected, rather than overlooked, by the Court.[3] The Defendants' motion to reargue as to these issues is therefore denied.

■ The Defendants have directed the Court to one ground for reduction of the damages assessed against them, addressed in their briefs, which was overlooked in the January 21 Opinion. Reargument is appropriate where a court overlooks grounds for relief that were briefed in the underlying motion. *Heurtey v. Brichmont & Assoc.*, 1992 WL 54362, at *2, 1992 U.S. Dist. LEXIS 2348, at *6 (S.D.N.Y. March 4, 1992). Rule 3(j) provides that there shall be no oral argument on a motion to reargue unless the Court grants the motion and specifically directs that the matter shall be reargued orally. No oral argument is required in this case.

■ On the Special Verdict form used in *Pulizzi*, the jury was asked to state the economic damages arising out of Pulizzi's death with respect to his funeral expenses. The funeral bill in *Pulizzi* of $2,925 was in evidence, but the jury awarded $10,000 for this item of damages. There was no basis in the record for this award, and therefore the award of $10,000 for Pulizzi's funeral expenses shall be reduced to $2,925.

### Conclusion

For the reasons discussed above, the Defendants' motion to reargue is denied except with respect to the award for Pulizzi's funeral expenses. The Defendants' motion to reargue is granted with respect to this element of damages, and the award for Pulizzi's funeral expenses is reduced from $10,000 to $2,925.

It is so ordered.

---

**3.** These grounds include: the submission of the case to the jury on a design defect theory; the wording of the verdict form and the admission of certain evidence regarding Flintkote's allegedly reckless conduct; the evidentiary basis for the jury's finding that Flintkote acted in concert; the prejudicial effect of plaintiff's failure to disclose the identity of certain entities whom they may have given a release or covenant not to sue; the Court's limitation of the summation of Flintkote's counsel; and the jury's finding that Tabolt was not exposed to Rutland asbestos-containing cement.